687 A.2d 1375

**Byron C. BAILER et al.,**

v.

**ERIE INSURANCE EXCHANGE.**

**No. 137, Sept. Term, 1995.**

Court of Appeals of Maryland.

Jan. 27, 1997.

516

Gary G. Everngam (Schuman, Kane, Felts & Everngam, Chartered, on brief), Bethesda, for Appellants.

Robert B. Hetherington, Rockville, for Appellee.

Argued Before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

This appeal involves the construction of a personal catastrophe liability policy when the claim against the insured alleges invasion of privacy. The policy expressly covers invasion of privacy as "personal injury," but the policy then excludes "personal injury ... expected or intended" by the insured. Because of this ambiguity, and as more fully explained below, we shall hold that the policy covers.

The appellants, Byron C. Bailer and Victoria Bailer, husband and wife, own, as their primary residence, a dwelling in Rockville, Maryland. At all times relevant to the instant matter the Bailers were insured under three policies issued by the appellee, Erie Insurance Exchange (Erie): a basic homeowner's policy, an automobile liability policy, and the personal catastrophe liability policy at issue here.

The Bailers hired through an agency a Danish national, Majbrit Meier, as an au pair. In consideration of salary, room, and board Ms. Meier assisted the Bailers with house-

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

hold chores and child care. She was furnished her own room and private bath in the Bailers' home.

In the fall of 1993 Ms. Meier, who apparently had laundry drying in her bathroom at the time, asked Mr. Bailer's permission for her to shower in the bathroom that adjoined the Bailers' bedroom. Before giving Ms. Meier access to that bath, Mr. Bailer concealed there a video camera, focused it on the shower area, and turned on the camera. Ms. Meier used the shower and at some point learned that she had been video taped.[1] Ms. Meier left the Bailers' home and employment and sued both of them in the Circuit Court for Montgomery County for invasion of privacy. The Bailers called upon Erie to defend and to indemnify, but Erie declined to do either. The Bailers then engaged counsel to defend Ms. Meier's action against them, and they then brought the instant action against Erie in the Circuit Court for Montgomery County.

In the Bailers' action against Erie all parties moved for summary judgment, and the court granted Erie's motion. The Bailers appealed to the Court of Special Appeals, and this Court, on its own motion, issued the writ of certiorari prior to consideration of the matter by the Court of Special Appeals. The action against the Bailers by Ms. Meier was settled sometime prior to the Bailers' filing of their brief as appellants in the instant appeal.

I

■ Prior to addressing the merits of the parties' arguments, we notice a procedural point that must be addressed.

---

1. Precisely when and how Ms. Meier discovered the surreptitious video taping is not clear from the record. From the depositions of the Bailers it appears that, after Ms. Meier had showered, Mr. Bailer retrieved the tape and placed it in the pocket of a jacket hanging in his closet, without having viewed the tape. Several days later he discovered that the tape was missing. We know that Ms. Meier obtained the tape because she played it for Mrs. Bailer. It seems that Mr. Bailer had video recorded himself at the beginning of the relevant segment of the tape when he turned on the camera after having concealed it in the shower area.

When summary judgment was granted for Erie in the circuit court, the Bailers' claims were being asserted in an amended complaint that consisted of two counts. Count 1 sought a judgment "declaring that [the Bailers] are entitled to insurance coverage including defense...." Count II sought damages for breach of the insurance contract, measured by any judgment in favor of Ms. Meier, by attorney's fees and costs incurred in defense of the claim by Ms. Meier, and by attorney's fees and costs incurred in the prosecution of the action of the Bailers against Erie. The final order signed by the circuit court and the judgment as recorded on the docket simply recite that Erie's motion for summary judgment was granted as to all counts.

This form of judgment is improper in a declaratory judgment action. In *Broadwater v. State,* 303 Md. 461, 494 A.2d 934 (1985), this Court, speaking through Judge Smith and after reviewing dozens of our prior decisions, vacated a purported declaratory judgment and remanded that case for further proceedings. There the trial court had granted a motion to dismiss the declaratory judgment action for failure to state a claim upon which the relief requested by the plaintiff could be granted. We held "that the trial judge erred both in granting the motion to dismiss and in failing to declare the rights of the parties." *Id.* at 469, 494 A.2d at 938. Here, the judgment entered in the circuit court does not declare the rights of the parties.

■ It appears, however, that the action of Ms. Meier against the Bailers was settled prior to appellate briefing. Consequently, the need for a declaration of the rights of the parties, in order for it to operate prospectively, has become moot.

■ All of the relief now available to the Bailers consists of damages that have accrued, including counsel fees in the instant action. Recovery of the damages, accrued and unaccrued, is available under Count II, the breach of contract claim. This Court recognizes the recoverability of counsel fees and expenses incurred by an insured in successfully

prosecuting or defending a coverage issue with a liability insurer. *Continental Casualty Co. v. Board of Educ. of Charles County,* 302 Md. 516, 537–38, 489 A.2d 536, 546–47 (1985). That aspect of the Bailers' claim against Erie is part of their breach of contract claim. *Collier v. MD–Individual Practice Ass'n,* 327 Md. 1, 13–17, 607 A.2d 537, 543–45 (1992) (recovery of counsel fees and expenses incurred by an insured in successfully prosecuting or defending a coverage issue with liability insurer is an exception to the American rule disallowing counsel fees as part of expectation interest damages in breach of contract actions).

Accordingly, we proceed to address the merits of Count II of the Bailers' amended complaint.

## II

In this Court the Bailers rest their breach of contract claim exclusively on Erie's personal catastrophe policy. That policy states Erie's promise as follows:

"We will pay the ultimate net loss which anyone we protect becomes legally obligated to pay as damages because of personal injury or property damage covered by this policy. This applies only to damages in excess of the underlying limit or Self–Insured Retention." [2]

"Personal injury" as defined in the policy means:

"(1) bodily injury;

(2) libel, slander or defamation of character;

(3) false arrest, wrongful detention or imprisonment, malicious prosecution, wrongful entry or eviction, *invasion of privacy,* or humiliation caused by any of these."

(Emphasis added). It is this insuring agreement on which the Bailers rely.

---

**2.** In quoting portions of the Erie policy we have not reproduced bold type which at times is used to highlight terms that are defined in the policy.

Under the section of the policy headed "What we do not cover—Exclusions," appears the following:

"We do not cover:

. . . .

"(2) personal injury or property damage expected or intended by anyone we protect. We do cover reasonable acts committed to protect persons or property."

Erie relies on this exclusion, and the circuit court based its grant of summary judgment on this exclusion.

The major contentions are these:

A. The Bailers submit that, even if the injury were expected or intended by Mr. Bailer, the policy literally covers, or, at a minimum, becomes ambiguous because it expressly insures against liability for invasion of privacy.

B. Erie submits that there is no ambiguity in the policy because it should be construed to cover negligent invasions of privacy and to exclude only intentional invasions.

C. Erie submits, and the circuit court agreed, that intentional conduct and intentional results must be distinguished. Hence, says Erie, even if invasion of privacy is exclusively an intentional tort and even if the policy covers intended conduct that produces unintended results, the injury here was intended by the insured so that the exclusion applies.

D. Erie submits that a construction that permits insurance of an intentional injury is contrary to public policy.

No extensive review is required of the legal principles governing the construction of insurance policies. Under Maryland law, "[i]nsurance policies, being contractual, are construed as other contracts." *Bond v. Pennsylvania Nat'l Mut. Casualty Ins. Co.,* 289 Md. 379, 384, 424 A.2d 765, 768 (1981). As such, a court interpreting an insurance policy is to examine the instrument as a whole, focusing on the character, purpose, and circumstances surrounding the execution of the contract. *Pacific Indem. Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985). "[W]e accord words their ordinary and accepted meanings. The test is

what meaning a reasonably prudent layperson would attach to the term." *Id.* Unlike the law of some states which construes insurance contracts against the insurer, this Court holds that an insurance contract will be construed against the insurer only when an ambiguity remains after considering the intentions of the parties from the policy as a whole and, if necessary, after admitting and considering any relevant parol evidence. *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766–67, 556 A.2d 1135, 1138 (1989).

## A

Review of the subject catastrophe policy as a whole reveals that its coverage is integrated with the underlying automobile and homeowner's liability coverages. That interrelationship reinforces the Bailers' contention that the parties intended for the policy to cover liability for invasion of privacy.

The catastrophe policy requires the Bailers "to maintain in full effect during the policy period, without alteration, the policies shown on the Declarations ... as underlying insurance...." The schedule of underlying insurance lists the Bailers' basic homeowner's policy and the Bailers' automobile liability policy. With respect to claims that are covered by the underlying insurance, the catastrophe policy "applies only to damages in excess of the underlying limit...."

The Bailers do not contend that the underlying homeowner's policy covers Ms. Meier's claim against them. Under § II of that policy, dealing with, "Home and Family Liability Protection," Erie agrees to

> "pay all sums up to the amount shown on the Declarations, which anyone we protect becomes legally obligated to pay as damages because of bodily injury or property damage resulting from an occurrence during the policy period. We will pay for only bodily injury or property damage covered by this policy."

Under that policy bodily injury is "physical harm, sickness or disease, including mental anguish, and includes care, loss of services, or resulting death." Under that policy an "occur-

rence" is "an accident, including continuous or repeated exposure to the same general harmful conditions." The liability protection provisions of the basic homeowner's policy also contain substantially the same exclusion as found in the catastrophe policy for "[b]odily injury or property damage expected or intended by anyone we protect."

The types of tort liabilities such as malicious prosecution, slander, and invasion of privacy which are specifically included within the insuring provision of the catastrophe policy ordinarily are not covered under insuring provisions of the type found in Erie's basic homeowner's policy. This is because these torts typically do not involve bodily injury, *see Allstate Ins. Co. v. LaPore,* 762 F.Supp. 268, 270–71 (N.D.Cal.1991) (defamation); *Washington v. State Farm Fire & Casualty Co.,* 629 A.2d 24, 27 (D.C.1993) (defamation); *Cantrell v. Allstate Ins. Co.,* 202 Ga.App. 859, 860, 415 S.E.2d 711, 712–13 (1992) (false imprisonment and malicious prosecution); *Weaver v. Motorists Mut. Ins. Co.,* 62 Ohio App.3d 836, 839–41, 577 N.E.2d 703, 705–06 (1989) (defamation); or because these torts do not involve an accident, *see Metropolitan Property & Casualty Co. v. Murphy,* 896 F.Supp. 645, 647–48 (E.D.Tex. 1995) (invasion of privacy by voyeurism); *Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633, 635–36 (Tex.1973) (property damage); or because the damages were expected or intended by the insured, *see Snakenberg v. Hartford Casualty Ins. Co.,* 299 S.C. 164, 383 S.E.2d 2, 6–8 (1989).

The insuring provision in the Bailers' catastrophe policy differs from that in their underlying homeowner's policy and from those in the foregoing cases. The catastrophe policy enlarges the coverage from "bodily injury" to "personal injury" and then defines the latter term specifically to include certain enumerated torts among which is invasion of privacy. Further, the subject catastrophe policy makes plain that it is intended not simply to operate as excess insurance over the limit of the required underlying insurance but also to operate as primary coverage for certain risks that are not covered at all by the underlying policy. In the latter instances, the

catastrophe policy pays in excess of the "Self–Insured Retention." "Self–Insured Retention" means

> "the amount shown on the Declarations which is retained and payable by anyone we protect with respect to each occurrence not covered by underlying insurance but which is covered by this policy. All expenses incurred by us, or by anyone we protect with our consent, in the investigation or defense of a claim or suit within the self-insured retention shall be payable by us."

Per their Declaration, the Bailers' Self–Insured Retention is $500 for each occurrence.

Consequently, the policy clearly seems to have been drafted to provide some insurance against liability for claims based on invasion of privacy, under which Erie would pay the damages above the Self–Insured Retention of $500 up to the catastrophe policy limit per occurrence, as well as paying all costs of defense.

Indeed, it appears that personal umbrella liability policies are marketed as providing coverage for the torts enumerated in the Bailers' policy. In an article by W.A. Mueller, C.P.C.U., "Insurance Quiz: Personal Umbrella Liability Insurance," appearing in *American Agent & Broker,* Nov. 1988, at 50, the author points out that "agents and brokers sometimes overlook the coverage enhancements included in [personal umbrella liability policies]." Mueller states that "[g]enerally, these policies provide insuring agreements" for "[p]ersonal injury liability," which includes "[f]alse arrest, [i]nvasion of privacy, [d]efamation of character, [s]lander, [l]ibel, [h]umiliation, [m]alicious prosecution, [w]rongful detention [and] [w]rongful entry." *Id.* Then, listing that which "usually is excluded in personal umbrellas," the author includes "[i]ntentional injury," without any attempt at reconciling the two statements. *Id.* at 52. *See also* J. Novak, "Leaky Umbrellas," Vol. 157, *Forbes,* Mar. 11, 1996, at 174.[3]

---

3. The article in *Forbes* was inspired by the author's understanding that President William Jefferson Clinton's insurers are defending under a

The complexity in the case before us lies in the exclusion. If the exclusion totally swallows the insuring provision, the provisions are completely contradictory. That is the grossest form of ambiguity, and Erie, unquestionably, would be obliged to defend and indemnify. We turn then to Erie's arguments that undertake to resolve the patent ambiguity.

### B

Erie's attempt to split the tort alleged by Ms. Meier into intentional or negligent invasions of privacy has no merit. This Court recognized the tort of invasion of privacy in *Carr v. Watkins*, 227 Md. 578, 586–88, 177 A.2d 841, 845–46 (1962), and subsequent cases have approved the definition of the term set out in Restatement (Second) of Torts § 652A (1977) (Restatement):

"General Principle

"(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

"(2) The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another . . .; or

(b) appropriation of the other's name or likeness . . .; or

(c) unreasonable publicity given to the other's private life . . .; or

---

reservation of rights in the litigation reported as *Jones v. Clinton,* 869 F.Supp. 690 (E.D.Ark.1994), *aff'd in part, rev'd in part and remanded,* 72 F.3d 1354 (8th Cir.), *cert. granted,* —— U.S. ——, 116 S.Ct. 2545, 135 L.Ed.2d, 1066 (1996). The article describes State Farm as the nation's largest umbrella writer. J. Novak, "Leaky Umbrellas," *Forbes,* Mar. 11, 1996, at 174. The author states:

"The State Farm umbrella, as is typical, raises the personal liability limits of coverage you already have on your auto and home policies and provides coverage for some liabilities that wouldn't be covered at all in a homeowner policy. For example, it provides protection for suits charging you with invasion of privacy, malicious prosecution, defamation and false imprisonment. . . ."

*Id.*

(d) publicity that unreasonably places the other in a false light before the public. . . ."

See *Lawrence v. A.S. Abell Co.,* 299 Md. 697, 700–02, 475 A.2d 448, 450–51 (1984); *Hollander v. Lubow,* 277 Md. 47, 54–55, 351 A.2d 421, 424–25, *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *Beane v. McMullen,* 265 Md. 585, 599–601, 291 A.2d 37, 44–45 (1972); *Household Fin. Corp. v. Bridge,* 252 Md. 531, 535–38, 250 A.2d 878, 881–83 (1969). In *Household Fin. Corp.* we agreed with the analysis of Professor Prosser in his *Handbook of the Law of Torts* (3d ed. 1964), Ch. 22, at 832, that invasion of privacy

" 'is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff "to be let alone." ' "

*Id.* at 537, 250 A.2d at 882 (emphasis omitted).

Ms. Meier alleged that form of invasion of privacy consisting of "unreasonable intrusion upon the seclusion of another, as stated in § 652B." Restatement § 652A(2)(a). Restatement § 652B states the rule to be that

"[o]ne who *intentionally* intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

(Emphasis added).

*Snakenberg v. Hartford Casualty Ins. Co.,* 299 S.C. 164, 383 S.E.2d 2, is instructive on the intent element of "Intrusion Upon Seclusion" described in Restatement § 652B. In that case the insured induced teenage females to model bathing suits at his home. Unknown to the "models," the insured video taped them while they were using a bedroom to change into and out of the swimsuits. When the insured was sued for invasion of privacy, the insurer refused to defend under a homeowner's policy that was substantially similar to the Bail-

ers' underlying homeowner's policy. Rejecting the insured's argument that he sought only to guard the swimsuits from theft by video taping the women, and applying the exclusion "for damages intended or expected by the insured," 383 S.E.2d at 4, the court held:

"[W]rongful intrusion into private affairs always involves an intentional act. It is mistaken to conclude, as [the insured] does, that if malice is not an element of invasion of privacy, neither is intent. The tort cannot be committed by unintended conduct amounting merely to lack of due care. Intentional conduct is a necessary element of the cause of action."

*Id.* at 7. The homeowner's policy in *Snakenberg* did not expressly insure against damages for liability for invasion of privacy.

■ Erie has not briefed whether forms of invasion of privacy, other than "Intrusion Upon Seclusion" under Restatement § 652B, can be committed unintentionally, and Erie does not argue that its policy, properly construed, insures against liability for some other form of that tort. Consequently, we express no opinion on such a possible construction. It is sufficient for present purposes to hold that the tort in the form alleged here does not accommodate Erie's proffered distinction between negligent and intentional conduct. That proposed distinction does not resolve the intrinsic contradiction in the policy.[4]

---

4. The dissenting opinion would hold that the "Intrusion Upon Seclusion" form of invasion of privacy can be committed unintentionally. That enlarges the tort beyond the confines of Restatement (Second) of Torts—confines beyond which this Court thus far has not gone. Although the dissent's position is one way of resolving the ambiguity *in this case,* that position imposes personal injury liability for negligent conduct that does not result in bodily injury. Thus, those persons who have only an underlying homeowner's policy in the language of the Bailers' underlying policy would have no insurance against this new liability. Under the majority position, persons who unintentionally intrude have not committed a tort, have no liability, and have no need for indemnification.

C

■ Erie next proposes that the insuring provision and the exclusion are properly reconciled by distinguishing between intended means and an unintended or unexpected result. For example, in *Haynes v. American Casualty Co.*, 228 Md. 394, 179 A.2d 900 (1962), a contractor's liability policy covered injury to property " 'caused by accident.' " *Id.* at 399, 179 A.2d at 904. The contractor's employees mistakenly excavated onto adjoining property where they destroyed forty-eight trees. We held that the liability was "caused by accident." Finding that there was some ambiguity as to whether both accidental means and accidental result were intended, or whether only the latter sufficed for coverage, we construed the policy against the insurer. *Id.* at 400–01, 179 A.2d at 904. Erie submits that the subject catastrophe policy would insure for an invasion of privacy that produces an unintended result, even if the means were intended. Nevertheless, Erie contends that the exclusion applies here because the conduct is intended and the harm is expected.

In cases dealing with basic homeowners' policies the Court of Special Appeals has construed the exclusion for damage either expected or intended by the insured by distinguishing between intent and result. *See Allstate Ins. Co. v. Sparks,* 63 Md.App. 738, 493 A.2d 1110 (1985) (policy covered when son of insured intended to steal gasoline from truck but did not intend to start fire that destroyed mill). *Compare Harpy v. Nationwide Mut. Fire Ins. Co.,* 76 Md.App. 474, 545 A.2d 718 (1988) (exclusion precluded coverage for insured who sexually abused his daughter because of substantial certainty of harm resulting from conduct). For cases applying various gradations of intended conduct to various types of harms, *see generally* J.L. Rigelhaupt, Jr., Annotation, *Construction & Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured,* 31 A.L.R.4th 957 (1984).

The vast majority of decisions collected in the above-cited annotation deal with policies other than those that contain

both the exclusion and an express covenant insuring against liability for one or more intentional torts. Within the latter class of cases it appears that courts have taken at least three approaches: (1) they avoid the problem; (2) they apply the distinction urged by Erie; or (3) they conclude that the policy is ambiguous and hold in favor of the insured.

The first class of cases is represented by *Shapiro v. Glens Falls Ins. Co.*, 39 N.Y.2d 204, 383 N.Y.S.2d 263, 347 N.E.2d 624 (1976). The insured was sued for allegedly willful and malicious defamation by two of his partners in a real estate investment syndicate. The insurer had issued a personal excess policy covering liability for personal injury that was defined to include libel, slander, defamation of character, and invasion of privacy. 383 N.Y.S.2d at 263, 347 N.E.2d at 625. The personal injury, however, could be " 'neither expected nor intended from the standpoint of the Insured.' " *Id.* at 264, 347 N.E.2d at 626. In addition, the policy included an endorsement excluding any personal injury " 'caused intentionally by or at the direction of the Insured.' " *Id.* In a memorandum opinion, the court, by vote of 4–3, held, without further explanation, that the exclusionary endorsement applied.

The three judge dissent in *Shapiro* illustrates the second approach to the apparently conflicting policy provisions. The dissenters found to be "patently untenable" the insurer's "contention that coverage for all intentional torts [was] avoided by the endorsement." *Id.* Instead, they would have held that "the endorsement excluding injuries caused intentionally should be construed to refer to those acts which are intentional in the sense that the insured deliberately desired to inflict injury, as opposed to merely desiring the natural consequences of his volitional acts." *Id.* at 265, 347 N.E.2d at 627.

Also illustrative of the second approach is Judge Motz's opinion for the United States Court of Appeals for the Fourth Circuit in *Fuisz v. Selective Ins. Co. of America*, 61 F.3d 238 (4th Cir.1995). The insured in that case sought defense and

indemnification under two identical personal catastrophe liability policies that were issued for successive policy periods. The policies covered damages because of personal injury, specifically defined to include libel, slander or defamation of character, and the policies also excluded coverage for " 'any act committed by or at the direction of an insured with intent to cause ... personal injury....' " *Id.* at 240. In the defamation action against the insured, the plaintiff alleged that the false accusations were disseminated to retaliate against the plaintiff for the loss of a business opportunity by the insured. *Id.* The court acknowledged that the policy provisions appeared to be in direct conflict but also recognized that defamation may be committed in two different ways, both of which were alleged in the complaint against the insured. *Id.* at 242–43. The complaint alleged that the insured, with an intent to injure the plaintiff, had published material known by the insured to be false. The complaint also alleged "New York Times" malice in that the insured recklessly disregarded whether his statements were true or false. Inasmuch as the latter allegations were not within the exclusion for intentional acts, the court held that the insurer had a duty to defend. *Id.* at 244–45.

As we noted in Part II.B, *supra*, the factual allegations in Ms. Meier's complaint against the Bailers and the version of invasion of privacy that is based on intrusion upon seclusion are not susceptible to the kind of distinction made in the *Fuisz* case. The specific tort alleged by Ms. Meier is only committed intentionally.

A third approach taken by courts in cases involving policies containing the apparent conflict that is presented here is illustrated by *Lineberry v. State Farm Fire & Casualty Co.*, 885 F.Supp. 1095 (M.D.Tenn.1995). There, in a new office building, two men had constructed a secret viewing room off of a recreation room and restroom that were connected to the office of one of the men. "Two-way mirrors were constructed into the walls of the recreation room and restroom so that anyone in the viewing room could look through the mirrors and observe occupants of the recreation room and bathroom

without the occupants' knowledge." *Id.* at 1096. One man would engage in sexual relations in the recreation room with an unsuspecting woman, while the other man video taped the activity from the viewing room. Four women who had been secretly video taped sued the men who, in turn, sued their insurer in the reported case for defense and indemnification under their personal liability umbrella policy. The policy defined "loss" to mean " 'an *accident* that results in *personal injury* ....' " *Id.* at 1097. In addition to bodily harm, "personal injury" was defined as

" 'b.   false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation;

" 'c.   libel, slander, defamation of character or *invasion of rights of privacy;* and

" 'd.   assault and battery.' "

*Id.*

The policy also provided that State Farm

" 'will not provide insurance ... for personal injury or property damage:

" 'a.   which is either expected or intended by you[.]' "

*Id.*

The same arguments made in *Lineberry* are made here. The *Lineberry* court reasoned that the tort alleged by the four women " 'consists solely of an *intentional* interference with [the plaintiff's] interest in solitude or seclusion....' " *Id.* at 1098 (quoting Restatement § 652B cmt. a). The court then held:

"In the instant case, the umbrella policy expressly covered injuries resulting from invasion of the right of privacy, an inherently intentional tort, but excluded injuries which were intended or expected. Therefore, the Court finds the coverage is illusory, and the policy is ambiguous and must be interpreted against the insurer and in favor of the insured."

*Id.* at 1099.

A personal liability umbrella policy was also involved in *Knowles v. United Servs. Auto. Ass'n*, 113 N.M. 703, 832 P.2d

394 (1992). That policy included coverage for wrongful eviction and excluded coverage for an injury that was expected or intended by the insured. The insured was sued by a neighbor for interfering with the neighbor's easement over the insured's property by having erected a locked gate across a road. 832 P.2d at 395. In its analysis the court first reviewed the line of cases which interpret the exclusion to operate only where the harm was intended, as opposed to the insured's performing an intended act that gives rise to some unexpected harm. The New Mexico court concluded that the insured "intended or expected harm of the same general type as was alleged by the [neighbor's] complaint." *Id.* at 398. The court also found that "the effect of the exclusionary clause at issue in the instant case is to nullify a broad grant of coverage." *Id.* Consequently the court held that "[t]he exclusion of coverage for acts intended or expected by [the insured] is repugnant to the insuring clause that promises broad coverage for injuries arising from wrongful eviction. The reasonable expectations of the insured can be upheld only if the repugnant clause is not given effect." *Id.* at 399.

A policy construction issue similar to that before us arose under a Law Enforcement Officers' Comprehensive Liability Policy in *Lincoln Nat'l Health & Casualty Ins. Co. v. Brown*, 782 F.Supp. 110 (M.D.Ga.1992). Manifesting no reluctance to express its frank opinion, the court said:

> "[T]here is an inconsistency in the policy. The policy defines 'personal injury' to mean not only 'bodily injury' but also 'false arrest,' 'malicious prosecution,' and 'assault and battery.' When this definition is read with the provision that only unintentional and unexpected 'personal injury' is covered, then the policy only applies to unintentional false arrest, unintentional malicious prosecution, and unintentional assault and battery. This is complete nonsense."

*Id.* at 112–13.

The court applied the rule that "when two provisions in an insurance policy 'are repugnant to one another,' 'the provision most favorable to the insured will be applied.'" *Id.* at 113

(quoting *United States Fire Ins. Co. v. Hilde,* 172 Ga.App. 161, 164, 322 S.E.2d 285, 288 (1984)).

In a periodical circulated in the insurance industry there is an incisive presentation of the problem now before us. D.S. Malecki, C.P.C.U., "Risk Management: Separation of Coverages in Underlying CGL Forms Deserves Attention," *Rough Notes,* Apr. 1990, at 34.[5] The author begins by observing that "bewildering problems often are raised by the way personal injury and advertising injury coverages are structured under umbrella liability policies." *Id.* Malecki says:

"One of the problem areas is that commercial umbrella policies, unlike primary policies, sometimes provide no clear division between the unintentional tort coverage of bodily injury and the intentional tort coverages of personal injury and advertising injury.

"In other words, the insuring agreements of some umbrella policies substitute personal injury in place of bodily injury, but then make coverage contingent on the happening of an occurrence or a result that is unexpected or unintended."

*Id.*

The author, whose column in the periodical is headed, "Risk Management," gives the following advice: "Commercial umbrella policies that combine the unintentional tort coverage of bodily injury with the intentional tort coverage of personal injury and make both subject to unexpected or unintended results should be avoided." *Id.* Unfortunately, it is too late to apply Mr. Malecki's advice in the instant matter.

We conclude that Erie's suggested reconciliation of the conflict in the policy terms does not apply to the claim

---

**5.** CGL stands for Commercial General Liability. "This type of insurance was previously called Comprehensive General Liability. When new policy forms were introduced in 1986, the name was changed because insurers believed that the term 'comprehensive' might constitute an invitation to courts to expand coverage beyond what insurers intended." T.D. Keville, *Advertising Injury Coverage: An Overview,* 65 S.Cal.L.Rev. 919, 919 n. 1 (1992) (citation omitted).

asserted against the Bailers by Ms. Meier. The subject policy is a personal, and not a commercial, liability policy. To the reasonable person the promise to pay damages for liability for invasion of privacy, at the time of contracting and under the circumstances presented here, refers to an intrusion upon seclusion. In other words, in an excess policy designed for owners of at least one house and at least one automobile, the contracting parties would not contemplate that the term, "invasion of privacy," primarily relates to such relatively exotic and usually commercial-context torts as appropriation of another's name or likeness, unreasonable publicity, or false light publicity.

Intrusion upon seclusion must always be intentional in order to be tortious, and it is the intrusion that constitutes the harm against which that form of invasion of privacy is intended to protect. Here, Ms. Meier alleged an intentional intrusion. There is no basis for contending that the policy will insure for intentional intrusions upon seclusion that do not result in intended or expected harm, but that the policy will not insure for intentional intrusions upon seclusion that do result in expected or intended harm. The insured's conduct, the invasion, and the claimant's harm, the invasion, are one and the same. Erie's proposed distinction in the context of this specific claim against the Bailers postulates that the policy insures and does not insure for the same conduct, at the same time, and in the same respect. The policy is at least ambiguous, and Erie was obliged to defend and indemnify.

### D

The circuit court entered summary judgment in favor of Erie for the additional reason that "it would be against public policy to allow an insurance company to indemnify someone for a wrongful act or crime committed with deliberate intention." Erie submits that the reasoning applied by the circuit court is a correct statement of the law, but Erie does not cite to us any cases involving insurance policies.

When Erie moved for summary judgment it predicated the motion exclusively on the legal construction of the policy language. Erie did not seek to submit any factual material designed to clarify the intent of the parties in the event the policy were determined to be ambiguous. From the underwriting standpoint this personal catastrophe policy is designed for persons who own their own homes, own one or more automobiles, and are sufficiently concerned about protecting their assets that they insure for excess and enhanced coverage in addition to their underlying liability coverage. Erie presented no evidence that persons to whom personal catastrophe policies are marketed become motivated by the insuring agreement intentionally to invade the seclusion of others or that Mr. Bailer was so motivated to video tape Ms. Meier.

The Bailers submit that the public policy argument was resolved adversely to Erie in *First Nat'l Bank of St. Mary's v. Fidelity Deposit Co.,* 283 Md. 228, 389 A.2d 359 (1978). We agree. There, we held that it was not contrary to public policy to insure against liability for punitive damages awarded in a civil action for malicious prosecution, even though the punitive damages in legal theory are predicated upon malice.[6] *Id.* at 241–43, 389 A.2d at 366–67. In the instant matter the Bailers seek to be made whole for compensatory damages and legal expenses. The instant case is an even weaker one for voiding the insuring agreement on public policy grounds than was the case presented in *First Nat'l Bank of St. Mary's, supra.*

For the foregoing reasons we shall reverse the judgment of the Circuit Court for Montgomery County in favor of Erie Insurance Exchange, and we shall remand this case for the entry of a summary judgment on liability in favor of the Bailers who, on further proceedings in the circuit court, may

---

**6.** With respect to punitive damages in a malicious prosecution action following *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), *see Montgomery Ward v. Wilson,* 339 Md. 701, 664 A.2d 916 (1995).

prove their damages under Count II of their amended complaint.

*JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED.  CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY THE APPELLEE, ERIE INSURANCE EXCHANGE.*

CHASANOW, J., dissents.

CHASANOW, Judge, dissenting.

In straining to provide insurance coverage for a "peeping Tom" with a video camera, this Court nullifies a specific limitation of coverage in an insurance policy.  In doing so the Court not only ignores the clear language of the insurance policy at issue, but also ignores one of the most fundamental rules of contract interpretation.

It is a fundamental rule of contract interpretation that if provisions of an insurance contract or of any other type of contract are apparently in conflict, the Court should first attempt to reconcile the provisions rather than to nullify arbitrarily one of the provisions of the contract.  *Chew v. DeVries*, 240 Md. 216, 221, 213 A.2d 742, 744–45 (1965).  All of the provisions of this contract can easily be reconciled; there is no need to nullify a clear limitation on coverage and rewrite the contract to make the insurance carrier pay for Mr. Bailer's intentional tortious conduct that the carrier expressly excluded from coverage.

In numerous prior cases, this Court has recognized some basic rules of contract interpretation that are not even acknowledged in the majority opinion.  The first is that when interpreting a contract a court will try to give effect to all of the agreement's provisions.  *See, e.g., Sagner v. Glenangus Farms*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964).  A related principle of the law of contracts is that courts will attempt to reconcile apparently conflicting provisions in construing an agreement.  *Chew*, 240 Md. at 221, 213 A.2d at 744–45; *see also Lumber Co. v. Bldg. & Savings Assn.*, 176 Md. 403, 5

A.2d 458 (1939). "[I]f a reconciliation can be effected by a reasonable interpretation, such interpretation should be given to the apparently repugnant provisions, rather than nullify any." *Chew*, 240 Md. at 221, 213 A.2d at 744–45.

The majority reads the instant policy as containing both an "exclusion and an express covenant insuring against liability for one or more intentional torts." 344 Md. 515, 528–29, 687 A.2d 1375, 1382 (1997). Finding a conflict between what it labels an "express covenant" and the exclusion provision of the policy, the majority nullifies the clear and specific exclusion. These provisions need not be construed as conflicting when they easily can and should be reconciled and read in harmony.

There are three relevant provisions in the insurance contract at issue. The first is the basic coverage provision. The insurance policy provides that:

> "We will pay the ultimate net loss which anyone we protect becomes legally obligated to pay as damages because of personal injury or property damage <u>covered by this policy</u>. (Emphasis added).[1]

The underlined qualifying language included in this coverage provision necessarily implies that some forms of personal injury and property damage are excluded from coverage. It seems clear that the policy does not cover all personal injury or all property damage; instead it only promises to pay the ultimate net loss as the result of personal injury and property damage which is *covered by this policy*. The majority seems to disregard entirely the limiting words "covered by this policy."

The next relevant provision is the definition of "personal injury." It is noteworthy that this is only a definition of the broad category "personal injury"; it is not and does not purport to be a definition of "personal injury covered by this policy." The term "personal injury" means:

---

1. In quoting portions of the Erie policy we have not reproduced bold type which at times is used to highlight terms that are defined in the policy.

"(1) bodily injury; (2) libel, slander or defamation of character; (3) false arrest, wrongful detention or imprisonment, malicious prosecution, wrongful entry or eviction, invasion of privacy, or humiliation caused by any of these."

Somehow the majority reads this provision as an "express covenant" insuring against all forms of invasion of privacy. This definition or this definition coupled with the previously cited clause clearly does not insure against all forms of invasion of privacy any more than it insures against all forms of bodily injury. I trust the Court is not suggesting that all forms of bodily injury are covered by this excess insurance policy. By defining the broad term "personal injury" the insurance contract does not say or imply that all forms of personal injury constitute "personal injury covered by this policy."

The final relevant provision of the policy is the clear and unambiguous intentional injury exclusion clause. This provision sets out the forms of personal injury that are not "covered by this policy." It is headed "WHAT WE DO NOT COVER—EXCLUSIONS." It provides:

"We do not cover:

\*　　\*　　\*　　\*　　\*　　\*

(2) personal injury or property damage expected or intended by anyone we protect. We do cover reasonable acts committed to protect persons or property."

The majority apparently concludes that "the exclusion totally swallows the insuring provision, the provisions are completely contradictory." 344 Md. at 525, 687 A.2d at 1380. This is not only a strained reading of this contract, it is also an affront to the maxim that courts should attempt to reconcile all provisions of a contract.

The three relevant provisions of this insurance contract are easily and obviously reconcilable. Certainly "a reconciliation can be effected by a reasonable interpretation." *Chew,* 240 Md. at 221, 213 A.2d at 744. The coverage provision applies to "personal injury or property damage covered by this policy." The broad definition of personal injury, not all of which is

covered by the policy, includes such things as bodily injury as well as invasion of privacy. The forms of personal injury which are not covered by the policy are found in the exclusion which provides that the policy does not cover "personal injury or property damage expected or intended by anyone we protect." This interpretation is in accord with the requirement that courts attempt to reconcile all provisions of any contract and not rewrite the contract by voiding any provision. The Bailers were sued for and apparently paid a settlement for an *intended* invasion of privacy,[2] and the intentional injury exclusion clause should be applicable to the claim against them.

The United States Court of Appeals for the Fourth Circuit recently construed a personal liability policy with terms analogous to those at issue in the present case in *Fuisz v. Selective Ins. Co. of America,* 61 F.3d 238 (1995). In *Fuisz, supra,* the personal liability policy at issue contained the following broad definition of coverage:

> "If a suit is brought against an insured for damages because of ... *personal injury,* ... caused by an occurrence to which this policy applies, [Selective Insurance Co.] will provide a defense at our expense by counsel of our choice." (Emphasis in original)(footnote omitted).

*Fuisz,* 61 F.3d at 240. The definition of "personal injury" included " 'injury arising out of ... [l]ibel, slander or defamation of character,' " but the policy excluded coverage for " 'any act committed by or at the direction of an insured with intent to cause ... personal injury....' " *Id.* Thus, the *Fuisz* policy contained the same potential conflict as the policy at issue in the present case.

The Fourth Circuit noted that "at first glance," the provisions might, as the majority argues in its opinion here, "appear to be in direct conflict, particularly when one recognizes that defamation is commonly classified as an 'intentional

---

**2.** Count II of the Complaint also alleged that Victoria Bailer had knowledge of and co-conspired with her husband to videotape Ms. Meier.

tort.' " *Fuisz,* 61 F.3d at 242–43. The *Fuisz* court held that the provisions were not in direct conflict, however, and the court expressly disapproved of the interpretation espoused by the majority in the present case, that the policy is inherently ambiguous and that it must be construed in favor of the insured:

> "if the intentional acts exclusion was strictly interpreted to eliminate coverage for injuries arising from all defamation claims because defamation is an intentional tort, then this exclusion would swallow the policy coverage for defamation, permitting Selective to 'give with the right hand and then take away with the left.' " (Citation omitted).

*Fuisz,* 61 F.3d at 243. The court was unwilling to interpret the exclusion in this way because such an interpretation would render the clause that purported to provide coverage for defamation meaningless. *Id.* Instead, the court held that some forms of defamation would be covered by the policy and some would not. *Id.*

> I am troubled by the statement in the majority opinion that: "To the reasonable person the promise to pay damages for liability for invasion of privacy, at the time of contracting and under the circumstances presented here, refers to an intrusion upon seclusion. In other words, in an excess policy designed for owners of at least one house and at least one automobile, the contracting parties would not contemplate that the term, 'invasion of privacy,' primarily relates to such relatively exotic and usually commercial-context torts as appropriation of another's name or likeness, or unreasonable publicity, or false light publicity.
>
> Intrusion upon seclusion must always be intentional in order to be tortious, and it is the intrusion that constitutes the harm against which that form of invasion of privacy is intended to protect."

344 Md. at 534, 687 A.2d at 1384. That statement seems to indicate that, based upon what the majority believes to be the understanding of the insured, the only form of invasion of privacy covered by this policy is unreasonable intrusion upon

seclusion. I assume the reason for this distinction is that apparently the majority does recognize that other forms of invasion of privacy might be committed recklessly or negligently. Rather than construe the insurance policy according to its express language and give effect to all of the policy provisions, the majority voids a clear and explicit intentional injury exclusion clause based on the tortured assumption that a "reasonable" policy purchaser would consider the term "invasion of privacy" to refer only to intrusion upon seclusion. The majority's construction further presumes that a "reasonable" policy purchaser is sufficiently knowledgeable of the law of torts to understand that an intrusion upon seclusion can only be committed intentionally and that, as a result, the inclusion of coverage for invasion of privacy supersedes the policy's intentional injury exclusion clause. A better way to construe this insurance policy is to assume the purchaser read the policy and recognized that it meant what it plainly said: coverage is available for invasions of privacy, bodily injuries, defamations of character, etc., except when they were committed intentionally; thus there was no coverage when the injury was "expected or intended." The express language of the policy is a better aid to construction than assumptions about a reasonable person who is ignorant of the variations of invasion of privacy, some of which may be committed unintentionally, but who does know what the Court of Appeals reveals for the first time in the instant case, that the unreasonable invasion of seclusion form of invasion of privacy can only be committed intentionally.

I should also note that the statement that "intrusion upon seclusion must always be intentional in order to be tortious," 344 Md. at 534, 687 A.2d at 1384, does not take into account indications to the contrary in several of this Court's prior cases. This Court has never before held that invasion of privacy must be intentional; to the contrary, we have indicated that for most forms of the tort, including *unreasonable* intrusion upon seclusion, the requirement is that the defendant must have acted unreasonably, not that the defendant must have acted intentionally. In *Beane v. McMullen,* 265

Md. 585, 291 A.2d 37 (1972), a case involving the issue of whether the McMullens' complaints to public authorities about the Beanes' possible violations of zoning and other county laws constituted an invasion of privacy, we said:

> "In all of the types of invasions of privacy, except perhaps '(b) Appropriation of the other's name or likeness,' reasonableness under the facts presented is the determining factor. We inquire then whether, under the facts of the present case, the Beanes produced legally sufficient evidence from which a jury might conclude that the complaints of the McMullens, already described, were unreasonable...."

*Beane,* 265 Md. at 600–01, 291 A.2d at 45. In *Household Fin. Corp. v. Bridge,* 252 Md. 531, 250 A.2d 878 (1969), a case involving the unreasonable intrusion upon seclusion by a debt collector making repeated phone calls to collect a debt, this Court stated:

> "As a prelude to a discussion of 'Unreasonable Intrusion,' we call to mind that we have elsewhere stated that the question of how far a creditor may go to collect his debt must be decided on the individual facts of each case, but usually on the ground of reasonableness. It is generally recognized that a creditor has a right to take reasonable measures to pursue his debtor and persuade payment, although the steps taken may result in some invasion of the debtor's privacy."

*Household Fin.,* 252 Md. at 540, 250 A.2d at 884. In *Household Finance* we also cited with approval *Harms v. Miami Daily News, Inc.,* 127 So.2d 715 (Fla.Dist.Ct.App.1961), a case finding liability for unreasonable intrusion upon seclusion invasion of privacy. We characterized *Harms* as follows:

> "In *Harms v. Miami Daily News, Inc., supra,* a columnist included the following item in his column, 'Wanna' hear a sexy telephone voice? Call —— and ask for Louise.' The telephone number given happened to be that of the business office of Louise's employer and the publication resulted in hundreds of unwanted telephone calls, not to mention the

resulting embarrassment from the innuendo contained in the wording of the publication. *Whether intentional or unintentional,* the defendant's action not only resulted in harassment of the plaintiff but cast aspersions on her character [and resulted in an unreasonable intrusion upon solitude]." (Emphasis added).

*Household Fin.,* 252 Md. at 541, 250 A.2d at 885. Certainly at the time this insurance policy was written Erie could have believed that lawsuits could be instituted against homeowners for unintended invasions of privacy including unintended intrusions upon seclusion, and Erie expressed its intent only to defend and compensate for unintended invasions of privacy.

A number of other jurisdictions recognize negligent invasion of privacy, without regard to type, as a valid cause of action. *See, e.g., Boyles v. Kerr,* 806 S.W.2d 255, 259 (Tex.Ct.App.1991)(stating that "the basis for liability in a privacy action may rest upon a negligent, as well as an intentional, invasion"); *Prince v. St. Francis—St. George Hosp., Inc.,* 20 Ohio App.3d 4, 484 N.E.2d 265, 268 (1985) (observing that "a negligent invasion of the right of privacy . . . can just as effectively invade one's right of privacy as an intention to do so").

Judge Turner correctly noted the distinction between intentional and negligent invasions of privacy in his written opinion and order below, observing that:

"The tort of invasion of privacy is usually one of an intentional act, however, it can be in the form of a negligent act under some circumstances. Clearly had this been a negligent invasion of privacy, the policy would have covered such a claim made against the Bailers. However, since this was clearly an intentional act on the part of the plaintiff, Byron C. Bailer, there can be no doubt that the exclusion under the policy of insurance would allow the defendant to deny defense and indemnification. Even though the definition of 'personal injury' encompasses the tort of invasion of privacy, it is still clear from the language of the policy that an *'intentional'* invasion of privacy shall not be covered.

There can be no doubt that Mr. Bailer intentionally intended the result of his acts both by deliberately filming Ms. [Meier] and in knowing or should have known that such an action would cause embarrassment, humiliation and injury to her." (Emphasis in original).

The policy potentially would provide coverage if, as Judge Turner posited at the summary judgment hearing, the camera had been placed in the bathroom in response to the theft of jewelry or other items from that room and the Bailers "negligently" failed to tell Ms. Meier about the camera when they permitted her to use the shower.

Part of the justification for the majority's reading of the policy is an apparent misreading of the Self–Insured Retention. The majority says "the policy clearly seems to have been drafted to provide some insurance against liability for claims based on invasion of privacy, under which Erie would pay the damages above the Self–Insured Retention of $500 up to the catastrophe policy limit per occurrence, as well as paying all costs of defense." 344 Md. at 524, 687 A.2d at 1379. Further, according to the majority the catastrophic personal liability policy "operate[s] as primary coverage for certain risks that are not covered at all by the underlying policy. In the latter instances, the catastrophe policy pays in excess of the 'Self–Insured Retention.' " 344 Md. at 523–24, 687 A.2d at 1379. Contrary to the majority interpretation, the Self–Insured Retention also is inapplicable to, and excludes, intentional injuries. The policy states:

" 'Self–Insured Retention' means 'the amount shown on the Declarations which is retained and payable by anyone we protect with respect to each **occurrence** not covered by underlying insurance but which is covered by this policy. All expenses incurred by us, or by anyone we protect with our consent, in the investigation or defense of a claim or suit within the self-insured retention shall be payable by us.' " (Emphasis in original).

What the majority apparently fails to recognize is that "occurrence" is a defined term in the homeowner's policy, as well as

in the catastrophic liability policy. In both policies " 'occurrence' means an accident." It is quite clear from the policies and from our prior cases that an "occurrence," when defined as an accident, excludes intentional conduct. *See, e.g., Sheets v. Brethren Mutual,* 342 Md. 634, 679 A.2d 540 (1996). Thus it would seem that the intentional invasion of privacy is not an occurrence because it is not an accident. Based on the established definitions of occurrence, the "Self–Insured Retention" is not applicable to intentional torts, and this not only fails to support the majority's interpretation, but is a further indication that intentional injuries are not meant to be covered by this policy.

Even though I disagree with the majority, I would not write a dissent if the majority opinion merely was a *sui generis* construction of a single insurance contract. The majority opinion is not simply interpreting what this insurance contract covers; it is interpreting what the majority thinks the insurance contract ought to cover. We must be cautious in rewriting insurance contracts by nullifying a material exclusion. Even though when construing statutes the Court has sometimes disregarded express language in order to interpret what the Court thinks the legislature intended, *see Kaczorowski v. City of Baltimore,* 309 Md. 505, 525 A.2d 628 (1987), we should not rewrite insurance contracts based on what we think the insured might have intended.

In broadening this personal catastrophic liability policy to cover intentional torts and possibly include punitive damage liability the majority states, "the subject catastrophe policy makes plain that it is intended not simply to operate as excess insurance over the limit of the required underlying insurance but also that it operates as primary coverage for certain risks that are not covered at all by the underlying policy." 344 Md. at 523, 687 A.2d at 1379. Based on the majority's expanded coverage reading of this policy, it is probably the best bargain in the insurance industry. The Bailers' basic automobile policy had a limit on personal liability of $300,000. The Bailers' homeowner's policy had a limit on personal liability of $100,000 and excluded intentional torts. The Bailers paid an

annual premium of $311.20 for their homeowner's policy. The catastrophic policy raises the limit of personal liability to $1,000,000 in both the automobile and the homeowner's policy and, according to the majority, is also designed to extend coverage to certain intentional torts (and conceivably punitive damages), yet the annual premium for this extensive coverage is only $115.

Erie did not intend to insure against all forms of personal injury. It intended to exclude "personal injury which was expected or intended by the insured" and it clearly said so. Certainly, there is nothing improper about an insurance company contractually refusing to defend or pay claims for intentional torts or intended personal injury. Some jurisdictions even consider it against public policy to *permit* an insurance company to insure for a policyholder's deliberate tortious conduct. *See, e.g., Nielsen v. St. Paul Companies,* 283 Or. 277, 583 P.2d 545 (1978); *Ambassador Insur. Co. v. Montes,* 147 N.J.Super. 286, 371 A.2d 292 (1977), *aff'd,* 76 N.J. 477, 388 A.2d 603 (1978). We should not rewrite the policy by nullifying this intentional injury exclusion and should not force Erie to pay for intentional tort liability coverage that it explicitly excluded. Even if Mr. Bailer believed he was covered for all intentional personal injury or intentional invasion of privacy, his belief was not justified by the written contract. At best, from Mr. Bailer's perspective, there was no meeting of the minds as to coverage for intentional personal injury, and the contract as a whole should be nullified, entitling Mr. Bailer to a return of his premiums. Mr. Bailer did not rely on his interpretation to his detriment; he does not even remotely suggest that he committed this deliberate invasion of privacy because he expected to have insurance coverage if he was caught. Mr. Bailer is not entitled to have the contract rewritten and is not entitled to coverage which is clearly and obviously excluded by the insurance contract.

Mr. Bailer did not and could not make a claim under his homeowner's policy, which is at least as ambiguous as his excess policy. The Bailers' homeowner's policy only covered occurrences which excluded intentionally-caused injuries. We

should not rewrite this contract and nullify a material exclusion in a contract merely because it is an excess insurance policy. I do agree with the majority's implication that we would like our excess insurance policies to cover all liability that is not covered by our basic homeowner's policy, but insurance companies do not have to write excess policies without exclusions, and we should not rewrite insurance contracts to provide all the coverage we would like to have. It is obvious that Erie intended only to defend and, if necessary, indemnify for *un* intentional invasions of privacy. This intent could not have been made any clearer. By forcing Erie to defend and indemnify for any intentionally-inflicted damages, the Court has rewritten this policy and nullified a clear and explicit intentional injury exclusion. Insurance companies, like all other litigants, are entitled to have their contracts construed fairly and impartially. This Court should be mindful of its responsibility to read insurance contracts and not write insurance contracts. I respectfully dissent.