667 A.2d 940

**Karen A. PATTEN**

v.

**BOARD OF LIQUOR LICENSE COMMISSIONERS FOR BALTIMORE CITY.**

**No. 97, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Nov. 30, 1995.

Peter A. Prevas (Konstantine J. Prevas and Prevas & Prevas, on the brief), Baltimore, for Appellant.

J. Joseph Curran, Jr., Attorney General, Sheldon H. Laskin, Assistant Attorney General, Baltimore, for appellee, Board.

Richard W. Drury and McMullen & Drury, P.A., Towson, for appellees, Protestants.

Argued before FISCHER, HARRELL and MURPHY, JJ.

FISCHER, Judge.

Karen A. Patten (Patten) appeals from an order by the Circuit Court for Baltimore City affirming the Board of Liquor License Commissioners for Baltimore City (Board). The Board denied Patten's request for the transfer of the ownership and location of a liquor license. Patten raised the following issues for our consideration, which have been reworded and reordered:

I.   Did the circuit court err by recalculating the universe of possible protest votes from fifty to forty-nine?

II.   Did the circuit court err by affirming the Board's decision to allow a one-half vote of protest for World Cars, Inc. (World Cars), even though its corporate charter had been forfeited?

III.   Did the circuit court err by allowing one vote of protest for 838 South Bond Street, where three of the four co-owners actually voted against the transfer?

IV.   Did the circuit court err by affirming the Board's decision to allow Mr. Allen Taylor to cast two protest votes

for London Court Limited Partnership and London Court General Partnership? [1]

## FACTS

On July 14, 1993, Patten filed an application with the Board for the transfer of the ownership and location of a class BD–7 Beer, Wine, and Liquor license. Patten wanted to relocate a liquor store from 714 South Broadway to 1606–08 Thames Street.[2] Notice of the proposed transfer was advertised to the surrounding Fells Point community. Members of the community protested and invoked the "51%" rule.[3]

On October 28, 1993, the Board conducted a hearing and determined the number of votes for and against the application. The Board determined that the number of voters eligible to vote on the Patten matter was fifty. This number was calculated by using computer listings of the real property owners and property tax records provided by the Department of Public Works of Baltimore City. The Board's final vote count tallied twenty-seven and one-half out of fifty against the application. Pursuant to the "51%" rule, the Board rejected the proposed transfer plan.

After the Board rejected Patten's request, Patten appealed

---

1. These two partnerships will be collectively referred to as "London Courts" in the rest of the opinion.

2. Elise Gordon originally filed the transfer application with Patten, but withdrew her name before the Board's final decision.

3. Md.Code, (1957, 1994 Repl.Vol.) Art 2B § 10–202(e) reads, in part, "In Baltimore City if it appears that more than 50 percent in numbers of the owners of real or leasehold property situated within 200 feet of the place of business for which application is made are opposed to the granting of the license, or if more than 50 percent of those owners and tenants in combination of real or leasehold property located within 200 feet of the place of business for which an application for a license is made are opposed to the granting of the license, then the application may not be approved and the license applied for shall be refused [by the Board]." This rule is coined the "51%" rule.

to the circuit court, which affirmed the Board's mandate.[4] The circuit court found, *inter alia:* 1) the Board had miscalculated the universe of votes and, accordingly, the court reduced the universe from fifty to forty-nine; 2) the Board was correct to allow World Cars to cast a one-half vote of protest; 3) the Board was correct to allow one vote of protest attributable to 838 South Bond Street because a majority of its property owners filed objections to the application; and 4) the Board was correct to allow Taylor to cast the two votes of protest for London Courts because Taylor was an agent of both partnerships. Subsequently, Patten filed a timely appeal with this Court.

### STANDARD OF REVIEW

Because this case involves an appeal from an administrative agency, it is important that we make clear the applicable standard of review. Md.Code, (1957, 1994 Repl.Vol.) Art. 2B § 16–101(e)(1)(i)[5] outlines the scope of review for a Board's decision. Section 16–101(e)(1)(i) reads, in part:

> Upon the hearing of such appeal, the action of the local licensing board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the petitioner to show that the decision complained of was against the public interest and that the local licensing board's discretion in rendering its decision was not honestly and fairly exercised, or that such decision was arbitrary, or procured by fraud, or unsupported by any *substantial evidence,* or was unreasonable, or that such decision was beyond the powers of the local licensing board, and illegal. (Emphasis added.)

---

**4.** The Board and the protestants, through their respective counsel, participated in the proceedings before the circuit court. They remain as appellees before us.

**5.** In 1994, during the course of the proceedings before the circuit court, this article of the Maryland Code was renumbered. Throughout this opinion we will use the current citations for the applicable Maryland Code sections.

This scope of review is similar to the scope of review afforded other administrative agencies under the substantial evidence standard. *See* Md.Code (1984, 1993 Repl.Vol., 1995 Supp.), § 10–222(h)(3) of the State Gov't Art. (stating that a reviewing court may reverse a decision of an administrative agency if, *inter alia,* that decision is not supported by "competent, material, and substantial evidence"). The Court of Appeals has described the substantial evidence standard this way:

> The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to *whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.* This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.

*Department of Economic & Empl. Dev. v. Jones,* 79 Md.App. 531, 534, 558 A.2d 739 (1989) (*quoting Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 309–310, 236 A.2d 282 (1967)) (emphasis added); *see also Caucus Distributors, Inc. v. Maryland Sec. Comm'r,* 320 Md. 313, 324, 577 A.2d 783 (1990) (describing the substantial evidence standard as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion).

▮ Reviewing courts do not apply the substantial evidence test to every aspect of an agency decision. For example, questions of law are not afforded any deference by a reviewing court. *Liberty Nursing Ctr. v. Department of Health & Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941 (1993). Thus, the scope of judicial review for findings of fact or mixed questions of fact and law is narrow, *United Parcel Service, Inc. v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226 (1994), but there is no such limitation on the review of questions of law.

## DISCUSSION

This appeal focuses on four sets of protesting properties within the Fells Point area. The first set of properties is located at 1605 and 1607 Shakespeare Street. Because the circuit court believed that Gloria J. Hyatt (Hyatt) owned the two contiguous lots, the court gave her only one possible vote in the universe of possible votes. In concluding so, the circuit court reduced the pool of possible votes from fifty to forty-nine.

The second disputed property is located at 1619 Shakespeare Street and is owned by World Cars, Inc. (World Cars). World Cars forfeited its corporate charter to the State of Maryland four years prior to the Board vote. World Cars, via an affidavit by an individual "owner," submitted a one-half protest vote.[6]

The third property is located at 838 South Bond Street. This property, co-owned by Dorothy Pabst, Rev. Louis Pabst, Audrey Poulton, and Louis Poulton, was awarded one protest vote. Dorothy Pabst went to the Board's hearing and voted in person against the transfer application. Rev. Louis Pabst and Audrey Poulton filed their protests by affidavit. Louis Poulton was unable to vote because he was in intensive care at a local hospital.

The final set of disputed properties is located at 1616 Thames Street, owned by London Court Limited Partnership, and 1628 Thames Street, owned by London Court General Partnership. Both properties were afforded separate votes of protest. Mr. Allen Taylor (Taylor), who was not a partner in either entity at the time of the Board vote, acted as manager or agent on behalf of London Courts and cast the votes of protest.

## I.

██ Patten first argues that the circuit court erred by reducing the possible universe of votes from fifty to forty-nine.

---

6. The other one-half vote was afforded to the tenant of the building. The tenant's vote is not at issue in this appeal.

The circuit court found that Hyatt owned contiguous lots at both 1605 and 1607 Shakespeare Street. Appellees argue that the circuit court was correct in its determination of ownership. We agree with Patten that the circuit court erred in reducing the universe of votes.

Our review of the record leads us to believe that at the time of the Board hearing, Hyatt owned the lot at 1605 Shakespeare Street and Edward Fell Graveyard (Graveyard) owned the lot at 1607 Shakespeare Street. The real property file, which lists the owners of the lots subject to this action, supports the Board's position on this issue. It lists Hyatt as the owner of 1605 and Graveyard as the owner of 1607. Additionally, in the Board's listings of the parties in opposition to the transfer, it listed Hyatt as owner of "1605 Shakespeare Street." It did not list Hyatt as the owner of 1607 Shakespeare Street.

The circuit court based its decision on an affidavit signed by Hyatt that listed her property as "1605–07 Shakespeare Street."[7] There is no other piece of evidence in the record indicating that Hyatt owned two separate lots. Hyatt filed her objection through an affidavit and thus did not testify at the meeting. The appellees offer no explanation for the discrepancy between the property listings and the affidavit.

There was substantial evidence to support the Board's findings. The relevant and competent evidence before the Board was sufficient to support its findings. Accordingly, the circuit court's decision to change a factual finding of the Board was clearly erroneous and not supported by the record.

Thus, the running sub-total tally is 50 possible votes with 27 voting against the transfer or 27:50.

---

7. *Patten suggests that Hyatt listed her property located at 1605 Shakespeare Street as 1605–07, with the house at "1605" and the lot behind listed as "1607." Both the real property records and real property plats indicate that lot 1607 is a separate lot located not behind, but next to lot 1605. Even if Hyatt's listing of "1605–07" was intended to indicate a possessory interest in two separate lots, the record does not support this contention.*

## II.

Patten next argues that the circuit court was incorrect in allowing World Cars, acting through its alleged director of trustees, Mr. Doetsch (Doetsch), to cast a one-half vote of protest.[8] Patten insists that World Cars forfeited its charter four years prior to the Board's vote, and that this prevents World Cars from casting a vote of protest. The Board, on the other hand, argues that World Cars' vote of protest was part of its "winding up" duties. We agree with Patten that World Cars should not have been afforded an opportunity to cast a one-half vote of protest.

A director of a corporation is afforded certain powers for dealing with corporate interests even after the corporate charter has been forfeited. Md.Code, (1975, 1993 Repl.Vol., 1995 Supp.) § 3–515 of the Corp. and Assoc. Article outlines these powers, including "winding up" duties.[9] Nowhere in section 3–515, or anywhere else in the Maryland Code, does it state that a director, as part of his "winding up" duties, is able to exercise the type of power that was allowed to be wielded by Doetsch in this case.

A corporation whose charter has been forfeited has no legal existence. Md.Code § 3–513 of the Corp. & Assoc.Art. (stating that when a corporate charter is forfeited, the corporation

---

8. Patten questions whether Doetsch was an actual director of World Cars. Patten insists that Doetsch was merely the "owner" of World Cars. In the alternative, Patten suggests that Doetsch, if he is the director, did not act with the consent of the board of directors. Because of our holding on this issue, we choose not to analyze these concerns, except to say that we are convinced that the Board's determination that Doetsch could represent World Cars was a correct decision.

9. Section 3–515, titled "Powers of directors on forfeiture," lists, in part:
    c) Specific powers.—The director-trustees may:
    (1) Carry out the contract of the corporation;
    (2) Sell all or any part of the assets of the corporation at public or private sale;
    (3) Sue or be sued in their own names as trustees or in the name of the corporation; and
    (4) Do all other acts consistent with law and charter of the corporation necessary or proper to liquidate the corporation and wind up its affairs.

is dissolved); *see Atlantic Mill & Lumber Realty Co. v. Keefer,* 179 Md. 496, 499–500, 20 A.2d 178 (1941); *see also FDIC v. Heidrick,* 812 F.Supp. 586, 592 (D.Md.1991) *aff'd,* 995 F.2d 471 (4th Cir.1993) (stating that, under Maryland corporate law, when a corporation forfeits its charter, it generally has no legal existence). The "winding up" provision, however, allows for a corporation with a forfeited charter to dispense of its assets and complete corporate business. The "winding up" duties listed in section 3–515 are administrative in nature, in that they all are related to completing existing corporate business. There is, however, in this case, no rational relationship between section 3–515 and Doetsch's "right" to cast a vote of protest. In this case, it would be inconsistent with Maryland law and the policy underlining section 3–515 to permit Doetsch to cast a vote of protest against Patten's transfer request.

Our decision is made easier by the fact that World Cars forfeited its charter four years before the Board's vote. It is the length of time between the forfeiture and the Board vote that troubles us the most. *Arguendo,* even if the vote cast by Mr. Doetsch was consistent with "winding up" duties, the length of time between the forfeiture of the charter and the casting of the vote raises an unexplained, perhaps unexplainable, doubt as to there being any logical association between these two actions.

It may be reasonable to allow a corporation four years time to "wind up" its corporate affairs, but this is a determination that needs to be examined on a case by case basis. Doetsch was not finalizing a contract or selling off corporate assets. He cast a vote for a corporation that had no legal existence, in a matter that had very little, if any, relationship to the "winding up" duties listed in section 3–515. In the case *sub judice,* the facts dictate that it was not appropriate to allow World Cars to have a one-half protest vote.

Running, adjusted vote count: 26½:50.

## III.

██ Patten argues that the Board was incorrect in its award of one vote of protest attributable to 838 South Bond Street because only three of the four co-owners complied with the "affidavit rules." [10] The Board counters that there is no rule of unanimity requiring that all property owners must agree on a vote of protest. We agree with the Board that the "affidavit rules" do not require unanimity.

Contrary to Patten's interpretation, Maryland law does not require all property owners to appear in person or file an affidavit. The plain language of the "affidavit rules" does not dictate that we adopt such an interpretation. *See generally Rose v. Fox Pool Corp.*, 335 Md. 351, 359, 643 A.2d 906 (1994) (stating that statutory interpretation begins with the statutory language itself and the words of the statute need to be understood in their ordinary meanings). The language appears to be only discretionary; it dictates what property owners "may" do, as opposed to "shall" do.

Adopting Patten's strict approach would plunge the protest voting process into an unworkable system that would allow a minority of property owners to thwart the wishes of the majority. Single property owners would be able to prevent votes of protest, even if substantially outnumbered. Not only is this approach inconsistent with the wording of the "affidavit rules," it also flies in the face of common sense. *See generally*

---

10. This is our name given to the two provisions Patten relies on to support her argument for a unanimity requirement. Md.Code, Art. 2B § 16–301(b) reads, in part, that "[i]n case of property owned jointly, if one owner appears in person at the hearing as a protestant, the other owner's protest may be recorded by an affidavit." Rule 2.07(b) of the Rules and Regulations of the Board, April, 1993, provides, in part:

All protestants under this subsection, must appear in person at the hearing, provided, however, that the Board shall accept in lieu of personal appearance, an affidavit from such protestant or protestants who in the opinion of the Board have good and sufficient reason for failing to appear at said hearing.

Thus, Patten argues that co-owners of property cannot comply with the "affidavit rules" unless all property owners either appear in person or file an affidavit.

*First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 869 (1989), *cert denied,* 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990) (stating that the most fundamental guide to statutory construction is common sense). The "51%" rule, as made clear by its name, is intended to allow a majority of property owners to control the nature of their neighborhood. *See generally Comptroller v. Jameson,* 332 Md. 723, 732, 633 A.2d 93 (1993) (the main goal of statutory construction is to gauge the legislature's intent and the primary source of this intent is the words of the statute).

In this case, three of the four property owners complied with the "affidavit rules" and at least three of four wanted to vote against the Patten application. The fourth was in intensive care and was unable to file an affidavit or appear in person.[11] The circuit court was correct in finding that a mere majority of property owners, in this case, was sufficient to permit one vote of protest.

Running vote count: 26½:50.

## IV.

█ Patten argues that the circuit court erred by allowing Mr. Allen Taylor (Taylor) to cast two votes of protest for London Courts. Appellees counter that Taylor was an agent of London Courts and thus his votes of protest were appropriate. This issue requires us to answer two questions: (1) whether an agent can act on behalf of a partnership; and, if an agent can act, (2) whether Taylor qualifies as an agent of London Courts. We hold that agents can act for a partnership, but Taylor does not qualify as such on this record.

Patten offers two arguments to support her position that agents cannot represent a partnership. First, Patten argues that for a partnership to register a vote of protest under the "51%" rule, all the partners must either appear at the hearing or file an affidavit. If this is not done, under Patten's theory,

---

11. It is unclear from the record whether Louis Poulton intended to vote against Patten's transfer request.

the partnership is forbidden from casting a vote of protest. This argument is premised on the "affidavit rules," but as stated earlier, the "affidavit rules" do not require unanimity. Therefore, this argument fails.

In the alternative, Patten suggests that if one person can represent or bind a partnership, then this privilege should be limited to general partners. Thus, under Patten's approach, Taylor could not act as an agent for the partnership because he was not a general partner in London Courts. Maryland law, however, does not mandate that only general partners can act on behalf of a partnership.

We agree with appellees that partnerships can be bound by duly assigned agents. There is nothing in the Maryland Code that prohibits such a delegation of power by a partnership. Though we recognize that Maryland law characterizes partnerships as "an association of two or more persons," Black's Law Dictionary 1120 (6th Ed.1991), partnerships can still be bound by the actions of one partner. Md.Code (1975, 1993 Repl.Vol., 1995 Sup.) § 9–301 of the Corp. and Assoc. Article (providing that every partner is an agent of the partnership and that individual partners may act on behalf of the whole partnership); *see Kay v. Gitomer*, 253 Md. 32, 38, 251 A.2d 853 (1969) (stating that each partner acts both as a principal and an agent of the partners). It makes sense, from both a legal and common sense standpoint, that an agent, duly empowered by the members of the partnership and complying with the actual or apparent agency requirements, can legally represent and bind a partnership.

■ Because we hold that agents can represent a partnership, our next duty is to determine whether Taylor qualifies as an agent for London Courts. Patten argues that the record is devoid of any evidence illustrating that Taylor had the requisite legal authority to act as an agent for London Courts. Appellees assert, without referencing much in the way of evidence, that Taylor, as a property manager, was an agent for London Courts. We agree with Patten that Taylor was not a legal agent for London Courts.

■ An agency relationship is not simply an employer/employee or contractor/subcontractor relationship. This Court has described an agency relationship as one that "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to act." *Proctor v. Holden*, 75 Md.App. 1, 20, 540 A.2d 133 (1988) (quoting Restatement (Second) *Agency* § 1 (1958)). In Maryland, not every fiduciary relationship automatically equates to an agency relationship.

■ There are two ways to establish an agency relationship, either by written agreement or by inference. *Id.* If there is no written agency agreement, Maryland courts examine three factors to determine if an agency relationship exists. These three factors require: 1) an agent to be subject to the principal's right of control; 2) an agent to have a duty to act primarily for the benefit of the principal; and 3) an agent to hold the power to alter the legal relations of the principal. *Schear v. Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240 (1985) (citing to Restatement (Second) *Agency* §§ 12–14 (1982)). There was no written agency agreement in the case *sub judice,* so we need to examine the record to determine if there was substantial evidence to support the Board's finding.

The facts of the case *sub judice* are not substantial enough to convince a reasonable person that Taylor fits the legal definition of an agent. At best, Taylor was a tenant in one of the two London Court properties and a property manager of both. He oversaw the maintenance and repairs for the buildings. In return he received a rent credit of five hundred dollars per year.

■ It is possible for a property manager or maintenance worker to be an agent, but this determination is dependant on the specific factual relationship between the property manager and property owner. In the case *sub judice,* Taylor and London Courts did not have the type of fiduciary relationship necessary to effectuate an agency relationship. The record reflects that Taylor did not keep the financial books for the

partnerships, did not negotiate contracts, and did not lease the other property on behalf of London Courts. The record also illustrates that Taylor did not even have a written agreement acknowledging his position as a property manager. In other words, there is *nothing* in the record indicating that the partnership gave Taylor the legal authority to act on its behalf as an agent to the extent of authorizing him to vote on behalf of the partnerships.

Final vote count: 24½:50.

For the above stated reasons, the decision of the circuit court must be reversed. Patten is entitled to a hearing on the merits of her transfer application.

**JUDGMENT REVERSED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REMAND TO THE BOARD FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID ¼ by APPELLANT AND ¾ BY MAYOR AND CITY COUNCIL OF BALTIMORE.**