Filed:  December 17, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 97-2025
(CA-91-3179-JFM)

Banca del Sempione,

Plaintiff - Appellee,

versus

Provident Bank of Maryland,

Defendant - Appellant.

O R D E R

The court amends its opinion filed November 12, 1998, as follows:

On page 2, section 1, line 6 -- counsel's name is corrected to read "Alec W. Farr."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BANCA DEL SEMPIONE,
Plaintiff-Appellee,

v.

PROVIDENT BANK OF MARYLAND,
Defendant-Appellant.

and

SURIEL FINANCE N.V.,

No. 97-2025

Defendant,

JEANNE FARNAN,
Party in Interest.

UNITED STATES COUNCIL ON
INTERNATIONAL BANKING,
INCORPORATED,
Amicus Curiae.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-91-3179-JFM)

Argued: April 10, 1998

Decided: November 12, 1998

Before LUTTIG and WILLIAMS, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by published opinion. Senior Judge Butzner wrote the opinion, in which Judge Luttig and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Philip K. Howard, HOWARD, DARBY & LEVIN, New York, New York, for Appellant. Warren Lewis Dennis, PROSK-AUER ROSE, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Daniel M. Mandil, HOWARD, DARBY & LEVIN, New York, New York; Larry J. Gebhardt, James T. Heidelbach, GEBHARDT & SMITH, Baltimore, Maryland, for Appellant. Alec W. Farr, Orrie Dinstein, PROSKAUER ROSE, L.L.P., Washington, D.C., for Appellee. Brian J. Downey, Annandale, Virginia, for Amicus Curiae.

_____

**OPINION**

BUTZNER, Senior Circuit Judge:

Provident Bank of Maryland appeals the district court's judgment entered in favor of Banca Del Sempione (BDS) after a bench trial conducted pursuant to remand. We affirm.

I

The facts are stated in detail in previous opinions, Sempione v. Suriel Finance, N.V., 852 F. Supp. 417 (D. Md. 1994) (Sempione I, Black, C.J.), and Sempione v. Provident Bank, 75 F.3d 951 (4th Cir. 1996) (Sempione II). Briefly the record discloses that Rock Solid Investment (RSI), Provident's customer, sought a $6,700,000 loan from Suriel. The loan agreement required RSI to obtain a standby letter of credit (LOC) to secure payment of interest. The LOC was to be irrevocable, unconditional, transferable, and annually renewable in the amount of $750,000 for a period of seven years. Suriel arranged to borrow funds from BDS to make the loan to RSI, and BDS insisted that the LOC securing interest must be renewable each year for the life of the loan.

Provident arranged for Manufacturers Hanover Trust to confirm the LOC for one year. Manufacturers provided that if its confirmation expired while the LOC was in existence, the LOC would be available

from Provident. BDS satisfied itself that Provident had sufficient assets to honor the LOC.

Manufacturers sent its confirmation to Suriel and BDS, which was acting as Suriel's advisory bank. BDS objected to the terms of the LOC because extension beyond one year was dependent on the maintenance of collateral for the LOC. Suriel voiced these objections, and in response Provident wrote a series of letters. The letters withdrew the condition pertaining to collateral and provided that the LOC shall be "automatically reavailable to you upon your receipt of our tested telex."

The LOC contained a clause expressly making it transferable. At Suriel's request, Manufacturers, acting as "transferring bank," transferred the LOC in its entirety from Suriel, the first beneficiary, to BDS, the second beneficiary. Manufacturers notified Provident of the transfer.

RSI posted $800,000 collateral to secure the Provident LOC. An official at Provident, however, allowed the collateral to be withdrawn from time to time in order for RSI to pay interest on the loan. Eventually the collateral was exhausted, and RSI was unable to pay the interest.

After several drawings by BDS for interest under the transferred LOC, Manufacturers dishonored a subsequent draw because it was in excess of the amount confirmed. Upon Provident's refusal to pay BDS directly, BDS instituted this action. This court reversed a summary judgment in favor of Provident and remanded the case for an evidentiary hearing. On remand, the district court held that the LOC obligated Provident to pay interest to BDS for the life of the loan; Provident has appealed. The district court also held that BDS was not entitled to recover punitive damages and attorney fees; BDS has not cross appealed these aspects of the district court's judgment.

II

The primary issue raised by Provident is whether a letter Provident wrote was a side letter--as Provident contends--or an amendment to

3

the LOC--as BDS contends. Although Provident sent a series of letters to Suriel, the district court considered Provident's letter of September 26, 1989, to be dispositive. This letter provided in part:

> RE: Standby Letter of Credit No. 99205
>
> Provident Bank of Maryland hereby agrees as follows with regard to our obligations under Standby Letter of Credit No. 99205 and in conformity with our commitment dated July 21, 1989:
>
> > "If you should draw on us your interest draft as set forth, the amount of $750,000 shall be automatically reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated."

Sempione II, 75 F.3d at 956. The author of this letter testified, and the court found, that he intended the letter to be a side agreement and not an amendment to the LOC. BDS, on the other hand, believed that the letter was an amendment to the LOC and acted upon that belief.

The district court held that the subjective intent and beliefs of the parties were not controlling. Instead, the district court held that the intent of the parties and the meaning of Provident's letter should be objectively ascertained in conformity with the official comment to MD. Code Ann. Com. Law § 1-205 (UCC § 1-205), which teaches that the meaning of a document must be determined by the language the parties used and their actions in the context of commercial practices. To plumb the meaning of the language and commercial practices, the district court turned to the Uniform Customs and Practices for Documentary Credits (UCP 1983, ICC 400, in effect at the time of this transaction), which is a code whose scope is "to be proved as facts." Md. Code Ann. Com. Law § 1-205(2) (UCC § 1-205(2)). The LOC expressly provided that it was subject to the UCP.

Both parties introduced the testimony of expert witnesses on these subjects. The district court, after carefully explaining its reasons, decided that the experts presented by BDS correctly explained that

4

according to the practices, usages, and customs of bankers, Provident amended the LOC to make it automatically renewable each year without conditions. The experts also explained that a "tested telex" was simply a ministerial act which did not impose a condition on the LOC. The letter was written on Provident stationery; it referred by number to the LOC that Provident had issued; it changed the terms of the LOC from one year as originally issued to an LOC that was "automatically renewable" if BDS found it necessary to draw on their interest draft. We conclude that the evidence amply supports the district court's conclusion that Provident amended the LOC to make it available to BDS for the life of the loan.

III

The second issue raised by Provident is

> whether a party (i.e. Suriel) that acquired a letter of credit amendment by deceit can then transfer it free of defenses, as if the letter of credit were a negotiable instrument.

Provident argues that it may use the defenses it had against Suriel, the transferor of the LOC, against BDS, the transferee. Provident also insists that Suriel was BDS's agent and that BDS was not a holder in due course and therefore cannot claim the protection accorded a negotiable instrument. Provident claims that BDS was an "involved beneficiary." As such, Provident argues, BDS was in control of the transaction and is accountable for Suriel's conduct. Provident asserts that a transfer of an LOC is treated as a contractual assignment and a transferee cannot have rights greater than the transferor.

The district court noted that Maryland law describes an agency relationship as "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958); accord Patten v. Board of Liquor License Comm'r, 107 Md. App. 224, 238, 667 A.2d 940, 947 (1995). Suriel was a borrower and BDS a lender. BDS was entitled to secure the payment of interest on the contemplated loan by insisting that Suriel obtain a LOC containing terms acceptable to BDS. In passing along to Provident the terms BDS required, Suriel was simply acting as a borrower anxious

5

to get a loan. The district court's conclusion that Suriel was not BDS's agent is consistent with Mellon Bank, N.A. v. Ternisky, 999 F.2d 791, 797 (4th Cir. 1993). There is no justification for vacating it.

The district court found that Provident had not proved sufficient evidence to establish that BDS knew or had reason to know of Suriel's conduct, which the district court described as "trickery." We perceive no reason for setting this finding aside.

A letter of credit "can be transferred only if it is expressly designated as `transferable' by the issuing bank." UCP Article 54(b); Md. Code Ann. § 5-116(1) (UCC § 5-116(7)). A transfer effectively substitutes the transferee (in this instance BDS, which became the second beneficiary) for the first beneficiary (Suriel). The transfer creates a "direct relationship" between the issuer (Provident) and the second beneficiary (BDS). See Sempione II, 75 F.3d at 964; Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S., 748 F. Supp. 177, 181-82 (S.D.N.Y. 1990). This new relationship between the issuer and the second beneficiary gives rise to the independence principle, which makes letters of credit effective instruments of commerce by assuring the transferee that the credit is free of defenses against the original beneficiary. John F. Dolan, The Law of Letters of Credit, ¶10.05 (1996) (hereafter Dolan).

The district court's opinion is consistent with the independence principle. Article 3 of the UCP establishes the independence principle of letters of credit as follows:

> Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the credit.

In San Diego Gas & Elec. Co. v. Bank Leumi, 50 Cal. Rptr. 2d 20, 24 (Cal. App. 1996), the court emphasized that the independence principle is essential to the utility of letters of credit in commercial transactions. The district court properly implemented that principle by applying it to the facts of this case. This concept or principle means

6

that the transferee (BDS) takes free of all the defenses that the issuer (Provident) has against the first beneficiary (Suriel). Cf. Cromwell v. Commerce & Energy Bank, 464 So. 2d 721, 732, 736 (La. 1985); Brown v. United States Nat'l Bank, 371 N.W.2d 692, 700 (Neb. 1985); article 3 UCP. A succinct statement of the independence principle is found in Dolan, ¶ 10.05: "Thus, although it is true that the transferable credit is not a negotiable instrument, it is not necessarily true that the transferee cannot have greater rights than those of the first beneficiary."

Provident relies on a statement in the official comment to Md. Code Ann. § 5-116 (UCC § 5-116) in which it is stated: "If it [LOC] is so designated [i.e. expressly designated as assignable or transferable], the normal rules of assignment apply . . .." This comment is correct with respect to assignments. But Provident cites neither cases nor texts that support the notion that the normal rules of assignment apply to the transfer of a letter of credit.

In light of the ambiguous comment to section 5-116, it becomes important to consider the practices and customs of banks engaged in international transactions involving letters of credit. An expert witness retained by BDS had been employed by Morgan Guaranty Trust Company of New York in the letter of credit department for 37 years. He also served on international committees that dealt with letters of credit. The district court credited this expert's testimony because of his broad experience in every aspect of letters of credit. Some of the letters of credit that he had the responsibility of issuing were transferable under the UCP. He testified: "As a matter of custom and practice the industry looks at the transfer to the second beneficiary as a separate undertaking, as a separate independent undertaking." JA 1907. Speaking of Provident's argument that an issuer's (Provident's) defense against the first beneficiary (Suriel) could be asserted against the second beneficiary (BDS), he testified: "In my opinion, if this view was to be taken it would destroy transferrable Letters of Credit because the second beneficiary wouldn't be able to determine, without a lot of effort, whether he has a good claim against the issuer under that separate undertaking that was transferred to him." JA 1908-09. He also testified that he never heard any banker or member of a letter of credit committee express a view in accord with Provident's argument.

7

We conclude that the district court properly decided that any defense Provident had against Suriel could not be asserted against BDS.

IV

A brief outline of the structure of the loan is helpful in understanding the parties' dispute about damages. The principal was secured by the Guaranteed Investment Fund (GIF), consisting of zero coupon bonds. BDS purchased the bonds on account of the borrower, and part of the proceeds of the loan reimbursed BDS. The loan agreement authorized BDS to sell the bonds at any time. At the end of the seven-year term of the loan, the loan was discharged without further payment.

The Provident LOC secured the interest. After a short bridge loan from a third party, RSI deposited some of the proceeds of the loan to secure the letter of credit, but Provident allowed RSI to deplete the deposit in order to pay interest. The loan agreement gave the borrower the right of anticipation after five years subject to certain conditions, but neither Suriel nor RSI complied with these conditions.

The borrower was obligated to pay interest on the "unpaid principal balance" of the loan. Provident argues that when BDS sold the zero coupon bonds, the principal of the loan was reduced, the borrower's obligation to pay interest was reduced, and the obligation of the LOC was also reduced. BDS argues that the GIF was the collateral for the loan and that the loan agreement gave it the right to "sell, discount, trade, or assign the proceeds of the Guaranteed Investment Fund (GIF) anytime during the loan term." JA 3907. Sale of the bonds, BDS argues, did not reduce the principal of the loan but rather was an exercise of the right, which the loan agreement granted, pertaining to the GIF.

The district court ruled that BDS sold the bonds pursuant to the loan agreement and that, consequently, Md. Code Ann. § 9-504 (UCC § 9-504), which governs the sale of collateral, was inapplicable. The district court concluded that the sale of the zero coupon bonds did not effect the right of BDS to claim interest on the entire principal. It reasoned that the GIF, not the bonds, was the collateral securing the note

8

and that the sale of the zero coupon bonds was not a sale of the GIF. Moreover, at the maturity of the loan, the borrower had the right to demand that the GIF was the sole source for repayment of the loan, regardless of the nature and amount of the GIF's assets. The borrower owed nothing more. In the words of the loan agreement, the "repayment obligation shall be non-recourse to the other assets of Borrower." JA 3907.

Because the GIF, and not the zero coupon bonds, was the collateral for the loan, the sale of the zero coupon bonds was not a sale of the collateral. Therefore, the entire loan amount was still unpaid after the sale, and BDS could still collect interest on the entire unpaid principal. As the district court observed, the transaction was not as onerous as it appears at first blush. Although RSI had to pay interest as a part of the loan proceeds it never received, it did not have to repay the principal of the loan.

RSI defaulted by failing to pay interest as it became due. The loan agreement provided for default interest at the rate of 5% above interest on the loan. The district court held that BDS should recover interest at the default rate after RSI defaulted. The court recognized, however, that the LOC has a $750,000 annual cap, and it denied recovery of interest in excess of the cap.

We affirm the district court's judgment pertaining to Provident's liability and the measure of damages including prejudgment interest and a limited amount of default interest.

AFFIRMED

9