**PROVIDENT BANK OF MARYLAND, Plaintiff–Appellant,**

v.

**TRAVELERS PROPERTY CASUALTY CORPORATION, formerly known as Aetna Life & Casualty Company, Defendant–Appellee.**

No. 00–1378.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 2000.

Decided Dec. 28, 2000.

**ARGUED**: Lawrence Jay Gebhardt, Gebhardt & Smith, L.L.P., Baltimore, MD, for Appellant. Edward C. Bacon, Bacon, Thornton & Palmer, L.L.P., Lanham, MD, for Appellee. **ON BRIEF**: James T. Heidelbach, Douglas S. Reinhart, Gebhardt & Smith, L.L.P., Baltimore, MD, for Appellant.

Before WIDENER, WILKINS, and NIEMEYER, Circuit Judges.

Vacated and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WIDENER joined. Judge WILKINS wrote a dissenting opinion.

## OPINION

NIEMEYER, Circuit Judge:

We must determine whether a "Check Stop Payment Liability" endorsement to a "Commercial General Liability" insurance policy provides the insured, a bank, with a right to a legal defense of a law-suit brought against it for its wrongful dishonor of drafts drawn on an irrevocable letter of credit. Because we conclude that the policy imposes a duty on the insurance company to defend the insured, we vacate the district court's judgment concluding otherwise and remand for further proceedings.

I

On May 22, 1991, Provident Bank of Maryland was served with a summons and complaint in the case of *Suriel Finance, N.V. v. Provident Bank of Maryland*, filed in the District of Maryland. The complaint alleged that Provident Bank wrongfully dishonored a draft drawn on a letter of credit it had issued. The suit demanded over $9 million in damages. Provident Bank forwarded the suit papers to Travelers Property Insurance Company ("Travelers"), its insurer.[1] Travelers acknowledged its receipt of the papers by a letter dated July 2, 1991, and notified Provident Bank of Travelers' appointment of counsel to defend the bank. In the letter, Travelers also stated:

> As you are aware, your coverage for this suit falls under the [Check Stop Payment Liability] endorsement to your policy. The limit of insurance on this endorsement is $100,000, subject to a deductible of $2500 per claim.
>
> The total amount of damages sought by the plaintiff is in excess of your policy limits and, therefore, any judgment ren-

---

1. The original insurer was a subsidiary of Aetna Life & Casualty Company, and Aetna Life and its subsidiaries subsequently merged with Travelers.

dered against you in excess of your policy limits will not be covered.

But a few weeks later Travelers wrote Provident Bank again and stated that it had reviewed the allegations and "other information available to us at this time" and was reserving its right to "disclaim coverage":

> There may be coverage under special Endorsement #6, for count III [wrongful dishonor claim]. If it is determined that coverage is available under this endorsement, the amount of coverage is limited to [$]100,000. This limit of insurance is stated in the Endorsement language.
>
> We will conduct any investigational activity in conjunction with the case under a full reservation of the company's rights. Such investigation or activity does not prejudice our right to disclaim coverage at a later date.
>
> We will inform you of our decision on these issues when our investigation is complete. In the meantime, your rights and interests are being protected.

The initial litigation was succeeded by a second suit entitled *Banca del Sempione v. Suriel Finance, N.V. and Provident Bank of Maryland*, which presented the same claims relating to Provident Bank's wrongful dishonor of a draft drawn on a letter of credit issued by it. Thereafter, in May 1992, Travelers again wrote Provident Bank about coverage, stating that Travelers had submitted the coverage question to its outside lawyers "for purposes of assisting our coverage determination." The letter continued:

> The findings of our coverage counsel were in agreement with the previous correspondence forwarded to you. We have been advised, however, that there does exist a potentiality of coverage with respect to Count III (Wrongful Dishonor of the Letter of Credit Under the UCC) as a result of Special Endorsement VI (Check Stop Payment Liability).

The letter reassured Provident Bank that Travelers would provide a defense for the wrongful dishonor claim and requested Provident Bank to have its counsel coordinate with Travelers' counsel to defend that claim. Travelers never withdrew its agreement to provide a defense of Count III through Provident Bank's lawyers, but it did continue to reserve its right not to pay any part of a resulting judgment. Following a six-week bench trial during March and April of 1997, the district court entered judgment against Provident Bank in the amount of $5,264,399.

The background against which this underlying suit was litigated involved a $6.7 million loan made by Banca del Sempione to Suriel Finance, N.V., which in turn loaned the money to its client, Rock Solid Investments, Ltd. Suriel Finance required Rock Solid Investments to secure the interest on this loan with an irrevocable letter of credit issued by a bank to Suriel Finance in the amount of $750,000, which credit was to renew annually. To obtain the letter of credit, Rock Solid Investments deposited $800,000 in certificates of deposit with Provident Bank and paid the bank a $39,375 fee. Under the arrangement, the beneficiary of the letter of credit, or any assignee thereof, could present a draft to Provident Bank for an amount up to the face amount of the credit and be paid that amount by the bank. The draft had to be accompanied by a certification that Rock Solid Investments had defaulted on its obligation to pay interest on the underlying loan.

A dispute later arose among the parties whether Provident Bank's $750,000 obligation under the letter of credit would automatically be "re-available" each year under a revolving arrangement, providing beneficiaries of the letter of credit with a total of $5.25 million upon which to draw. Provident Bank took the position that credit was limited to $750,000, and therefore, when Banca del Sempione, as assignee of the letter of credit, presented drafts that exceeded $750,000 by $113,250, Provi-

dent Bank refused to pay the $113,250 "overdraft."

The district court in the underlying case concluded, for complex factual reasons involving a purported side-letter amendment to the letter of credit, that Provident Bank was obligated to honor drafts on a revolving basis up to $5.25 million, and on that basis, it entered a $5.26 million judgment in favor of Banca del Sempione and against Provident Bank. We affirmed that judgment in *Banca Del Sempione v. Provident Bank*, 160 F.3d 992 (4th Cir.1998). In defending this lengthy litigation, which involved two separate appeals, Provident Bank incurred over $2 million in attorneys fees and costs.

Provident Bank filed this action to obtain reimbursement from Travelers for its litigation costs under a "Commercial General Liability" policy issued by Travelers to Provident Bank for the period April 1, 1990 through April 1, 1991. This policy included coverage for "wrongful dishonor" liability, or "Check Stop Payment Liability" as the endorsement was denominated. On cross-motions for summary judgment filed by the parties, the district court denied Provident Bank coverage under the policy. The court ruled that the Check Stop Payment Liability endorsement did not cover the wrongful dishonor claim because the endorsement contained an exclusion that withheld coverage for liability assumed by Provident Bank "under any agreement to be responsible for a loss," and the court found the letter of credit to be such an agreement. The court also ruled that Travelers did not have a duty to defend the underlying litigation for wrongful dishonor because, even if the exclusion did not apply, the Check Stop Payment Liability endorsement contained no duty to defend. The court added,

> [I]n the final analysis Provident's reading of the policy as a whole is strikingly unreasonable. It is simply beyond imagination that the Check Stop Payment Liability containing a $100,000 limit of liability was intended to impose

"potential liability" upon Travelers for millions of dollars in fees and costs for defending Provident in a sophisticated commercial transaction into which it voluntarily entered.

From the judgment entered in favor of Travelers, Provident Bank noticed this appeal.

## II

▮ Under Maryland law, which applies in this diversity action, the duty to defend, as may be imposed by a liability insurance policy, is a question of contract law determined by the intent of the parties as manifested in the language of the policy. *See Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 725 A.2d 1053, 1058 (1999). And the duty to defend exists only if (1) the insurance contract contains language that imposes the duty, and (2) there is a "potentiality" or "possibility" that the claim could be covered by the policy's duty to indemnify. *See Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 695 A.2d 566, 570 (1997); *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842, 850 (1975); *Utica Mutual Ins. Co. v. Miller*, 130 Md. App. 373, 746 A.2d 935, 939 (2000). Thus, in resolving the case before us, we first must determine whether, through application of Maryland contract law principles, the policy before us includes language imposing a duty to defend Check Stop Payment Liability endorsement claims, and second, if there is such language, whether the claim for which a duty to defend is asserted is potentially covered by the endorsement. We address these issues in order.

## A

▮ In ruling that the Travelers policy does not provide a duty to defend a potential claim under the Check Stop Payment Liability endorsement, the district court relied on a structural argument. It observed first that the endorsement itself does not include language imposing a duty to defend. It also noted that the body of

the Commercial General Liability policy provides coverages, A, B, and C, and that each coverage individually addresses whether Travelers has a duty to defend for claims made under the coverage. The court's analysis continued:

> Two of them, Coverages A and B, each contain a duty to defend clause. However, there is a third coverage, Coverage C, that does not. The Check Stop Payment Liability endorsement, in effect, provides a fourth coverage. Presumably, if a duty to defend were to attach to that coverage, the parties would have expressly so stated.

But the court then questioned its own conclusion. It stated:

> I recognize that the endorsement can be read not as creating a fourth category of coverage but as modifying the coverage provided by Coverage A. Under that interpretation of the policy, the duty to defend established in Coverage A might reasonably be deemed to be incorporated by reference into the endorsement.

The court rejected this possibility, however, because of its determination that it was "beyond imagination, that the endorsement would provide a duty to defend costing Travelers millions of dollars in fees when its indemnity obligation only covers $100,000." In making this point, the district court failed to recognize that under Maryland law, as elsewhere, the duty to defend is broader than the duty to indemnify. *See Litz*, 695 A.2d at 569–70. And that duty may, indeed, result in costs to the insurer greater than costs incurred to indemnify, unless, of course, the language of the duty to defend limits the costs available for a defense. *See Sherwood v. Hartford Accident & Indem. Co.*, 347 Md. 32, 698 A.2d 1078, 1083 (1997) ("Not infrequently, that expense [for defense] may approximate or even exceed the amount of any judgment rendered in the action"). Moreover, the court should not have permitted the costs to Travelers of a duty to defend to justify its determination of whether Travelers had such a duty.

On appeal, Travelers not only relies upon the district court's structural argument but also goes further, arguing that the Check Stop Payment Liability endorsement is "a stand-alone endorsement which does not provide a duty to defend."

Neither the analysis provided by the district court nor the argument made by Travelers examines the policy and endorsement as an integrated contract from which the intent of the parties must be derived. *See Collier v. MD–Individual Practice Assoc.*, 327 Md. 1, 607 A.2d 537, 539 (1992) ("To determine the intention of the parties . . . we construe the instrument as a whole" (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 488 A.2d 486, 488 (1985)) (internal quotation marks omitted)). That examination, when resorting to principles of Maryland contract law, discloses that the parties intended that the Check Stop Payment Liability endorsement would provide a *liability-type* coverage, not an *indemnity-type* coverage, requiring Travelers both to pay the litigation costs and to indemnify Provident Bank for any judgment up to $100,000. *See Brohawn*, 347 A.2d at 851 ("Although the type of policy here considered is most often referred to as liability insurance, it is 'litigation insurance' as well, protecting the insured from the expense of defending suits brought against him").

"In Maryland, insurance policies, like other contracts, are construed as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617, 619 (1995). Maryland does not follow the rule that insurance policies are to be construed against the insurer except when "an ambiguity remains after considering the intentions of the parties from the policy as a whole and, if necessary, after admitting and considering any relevant parol evidence." *Bailer v. Erie Ins.*, 344 Md. 515, 687 A.2d 1375, 1378 (1997).

As is typical with insurance policies generally, the insurance policy in this case contains (1) a page of declarations, stating the dollar limits for the coverages; (2) the terms of the coverages provided; (3) a list of endorsements that are incorporated into the policy; and (4) the general terms and conditions applicable to the entire policy. The declarations page lists three general coverages: Coverage A for liability for bodily injury and property damage; Coverage B for liability for personal and advertising injury; and Coverage C for first-party medical payments. These coverages are in turn modified by the endorsements that are expressly incorporated. The list of endorsements begins with the language—"It is hereby understood and agreed that this policy includes these endorsements and schedules"—followed by a list of 20 endorsements that are incorporated into the policy. Endorsement "Special VI," the Check Stop Payment Liability endorsement in question here, is headed by the interpretive instruction: "This endorsement modifies insurance provided under the following: Commercial General Liability Coverage Part." It is therefore apparent that this Check Stop Payment Liability endorsement modifies the Commercial General Liability Part to the extent provided in the endorsement. While the Check Stop Payment Liability endorsement itself does not include any duty-to-defend language, all liability coverages in the main body of the policy do include duties to defend. The only coverage for which a duty to defend is not provided is the coverage for medical payments, which is not a liability-type of coverage, but rather a first-party coverage.

Therefore, the Check Stop Payment Liability endorsement expands the liability protection to the insured, amending either Coverage A or Coverage B, because Coverages A and B constitute the entirety of the liability coverages. Regardless of which liability coverage the endorsement amends, a duty to defend is provided.

We cannot agree with Travelers that the endorsement is a stand-alone provision. Both the body of the policy and the endorsement itself belie Travelers' argument. The body of the policy lists the endorsements that are incorporated into the policy, including the Check Stop Payment Liability coverage. Similarly, the endorsement indicates that it "modifies" the liability coverage otherwise provided by the policy. Because the endorsement is incorporated into the main policy and modifies the liability coverage provided, it cannot be construed as a stand-alone coverage. The proper construction includes the endorsement coverage as part of the liability coverage afforded by the policy. And, as we have observed, all liability coverages in the policy afford not only indemnification for loss, but also the defense of related lawsuits.

■ Virtually every other indication given by the policy in this case points to the parties' intention that Travelers would have the obligation, as well as the right, to defend and control any litigation covered by the Check Stop Payment Liability endorsement. First, liability policies by definition typically include both a duty to defend and a duty to indemnify. *See Mesmer*, 725 A.2d at 1061 ("The promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums" (quoting *Brohawn*, 347 A.2d at 851)); *see also* Rowland H. Long, *The Law of Liability Insurance*, § 5.01 (pointing out that the duty to defend "is one of the most important obligations imposed by the[liability] policy of insurance and distinguishes liability insurance from most other forms of insurance"); *Couch on Insurance*, §§ 103:4, 103:5, 103:7 (3d ed. 1997) (indicating that the duty to defend is an important distinction between a liability policy and an indemnity policy).

Second, the general terms and conditions applicable to all liability portions of the policy indicate that the insured was to

be provided a defense of lawsuits. Section IV of the policy, which is applicable to the entire policy and which is entitled "Commercial General Liability Conditions," imposes duties on Provident Bank to notify Travelers of any claim "as soon as practicable," to send Travelers copies of suit papers "immediately," and to "[c]ooperate with [Travelers] in the investigation, settlement or defense of the claim or 'suit.'" These "liability" conditions could not be meaningful in the absence of a duty to defend. Because the Check Stop Payment Liability endorsement is a modification to the policy's liability coverage, it must be assumed that these "general" conditions are applicable also to that endorsement.

■ Finally, Travelers itself, as well as its outside attorneys, reached the conclusion that it had a duty to defend when it first received notice of the lawsuit. In its letter acknowledging receipt of suit papers, Travelers stated that it would be providing a defense. Later, when it provided the defense with the reservation of rights, it still took the position that the Check Stop Payment Liability endorsement modified either Coverage A or Coverage B, both of which provided for liability coverage. Finally, after consulting with independent counsel, Travelers wrote Provident Bank that "there does exist a potentiality of coverage with respect to [the wrongful dishonor claim]," and therefore Travelers "will provide a defense to [this claim]." The letter also stated unconditionally that "the potentiality of coverage obligates [Travelers] to provide a defense to this Count." While we agree with the district court that such insurance company letters do not extend coverage by estoppel where it otherwise would not exist, *see Prudential Ins. Co. of America v. Brookman*, 167 Md. 616, 175 A. 838, 840 (1934), we believe that these prelitigation interpretations by Travelers and its independent counsel are highly probative of the parties' actual intent and confirm the conclusion that the policy at issue is properly construed to provide typical liability-type coverage for wrongful dishonor liability—i.e., coverage that provides both indemnity and a defense.

Because providing liability coverage without affording a defense would have been so unusual, we believe that, had Travelers intended to withhold coverage of defense costs, it would have expressly called the endorsement an indemnification coverage or it would have disclaimed an obligation to defend Provident Bank against suits alleging wrongful dishonor. Its language would have been modeled on indemnity policies, not liability policies. But both policy language and policy structure indicate the coverages of a typical liability policy. Indeed, we find Travelers' position somewhat unusual for an insurance company that must administer many similar policies. By asserting now that the Check Stop Payment Liability endorsement is simply an indemnity provision, Travelers would, for the typical situation in which the loss was within policy limits, deprive itself of control over the defense of the litigation, encouraging the insured simply to default on the claim and have Travelers pay the loss.

B

■ Although we have concluded that the policy required Travelers to defend lawsuits against Provident Bank under the Check Stop Payment Liability endorsement, that duty is triggered only when a claim in a lawsuit is made against Provident Bank that, if resolved adversely to the bank, would potentially require Travelers to indemnify Provident Bank for the loss. *See Litz,* 695 A.2d at 570; *Brohawn,* 347 A.2d at 850; *Utica Mut.,* 746 A.2d at 939. As the Court of Appeals stated in *Brohawn,*

> Even if a ... plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.

347 A.2d at 850. Thus, we must turn to the language of the endorsement itself.

The Check Stop Payment Liability endorsement in this case provides in relevant part:

CHECK STOP PAYMENT LIABILITY

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. We will pay those sums you become legally obligated to pay as damages arising out of: . . .

B. the refusal to certify or pay; . . .

with respect to any check, note, or draft drawn upon or payable by any insured, and drawn or made by or bearing the acceptance of any depositor of the insured.

\* \* \*

2. This insurance does not apply to:

A. liability assumed by the insured under any agreement to be responsible for a loss. . . .

■ Provident Bank contends that when it wrongfully dishonored a draft presented by Banca del Sempione, as assignee of the letter of credit, it incurred liability for "the refusal to pay any draft"—precisely the liability covered by the endorsement. Although the bank acknowledges that the Stop Check Payment Liability endorsement excludes "liability assumed by [it] under any agreement to be responsible for a loss," it argues that a letter of credit is not an agreement to be responsible for a loss. Rather, it claims that a letter of credit is a primary obligation undertaken independently from the obligations of third parties.

Travelers, on the other hand, urges that we adopt the reasoning of the district court to find that the exclusion applies to deny Provident Bank coverage. The district court reasoned that the exclusion applied because Banca del Sempione was not entitled to draw upon the letter of credit unless its draft was accompanied by a certification that Rock Solid Investments had defaulted on its obligation to pay Banca del Sempione interest pursuant to the underlying loan agreement. This certification was made an express condition of any draft drawn on the letter of credit. Accordingly, the district court concluded that, because a draft could be honored only if accompanied by the certification of a default in the underlying loan, Provident Bank's dishonor of the draft resulted in a "liability assumed by the insured under [an] agreement to be responsible for a loss."

■ We agree with Provident Bank, as well as with other courts, that the bank's issuance of an irrevocable letter of credit on which drafts may be drawn creates the type of duty which, when breached, is covered by Check Stop Payment Liability insurance, i.e., "wrongful dishonor" insurance. This is because the bank's liability is created by its own default on an instrument that it issued, i.e., the letter of credit.[2]

Its liability does not arise from its agreement to answer for the loss of a third party, as would be the case in a hold-harmless agreement. The exclusion relied on by Travelers applies only if the bank's liability arises secondarily from an agree-

2. During the period relevant to this case, a "letter of credit" was defined by the Uniform Commercial Code to mean "an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this title (§ 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Md.Code Ann., Commercial Law I § 5–103(1)(a) (1997). Effective October 1, 1997, "letter of credit" was redefined similarly to mean "a definite undertaking that satisfies the requirements of § 5–104 of this title by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value." Md.Code Ann. Commercial Law I § 5–102(a)(10) (1999 Supp.).

ment to be responsible for a third party's primary liability. Typically, the exclusion covers liability of third persons adopted by the bank through an agreement to indemnify or hold harmless. *See, e.g., Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681 (7th Cir.1977) (concluding that policy language—"liability assumed [by the insured] under any written contract"— means "a specific written agreement between the insured and some third party whereby the insured agrees to 'indemnify' the third party"); *Commercial Union Ins. v. Basic Am. Med.*, 703 F.Supp. 629, 633 (E.D.Mich.1989) (holding that policy language—"liability assumed by the insured under any contract or agreement"—does not refer to liability incurred as a result of a breach of contract, but that contractual exclusion language operates only to deny coverage "in cases in which the insured in a contract with a third party agrees to save harmless or indemnify such party"); *Olympic, Inc. v. Providence Washington Ins. Co.*, 648 P.2d 1008, 1011 (Alaska 1982) (" '[l]iability assumed by the insured under any contract' refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract" (quoting *Continental Ins. Co. v. Bussell*, 498 P.2d 706, 710 (Alaska))).

■ The fact that drafts drawn on the letter of credit had to be accompanied by documentation certifying that the underlying loan agreement was in default did not transform the letter of credit into an agreement to answer secondarily for the loss of another. Indeed, Provident Bank would have been obligated to honor a draft whether an underlying loss had occurred or not. Upon presentation to Provident Bank of a draft with the certifying documentation, whether the documentation was substantively accurate or not, Provident Bank became obliged to honor the draft. *See Amwest Sur. Ins. Co. v. Republic Nat'l Bank*, 977 F.2d 122, 128–29 (4th Cir.1992) (interpreting same provision of the UCC as codified in South Carolina). Thus, even if Banca del Sempione had falsely certified the occurrence of the default when it presented a draft, Provident Bank would not have been relieved of its duty to honor the draft. This principle, known as the "independence principle," distinguishes letters of credit from guarantee contracts, in which, by contrast, the guarantor is only secondarily liable and therefore may assert any defense against the creditor's claim for payment that the primary debtor would have asserted. *See, e.g., Banca Del Sempione v. Provident Bank*, 160 F.3d 992, 995–96 (4th Cir.1998); *In Re Slamans*, 69 F.3d 468, 474 (10th Cir.1995); *Dibrell Bros. Int'l v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1579 (11th Cir.1994); *Alaska Textile Co. v. Chase Manhattan Bank*, 982 F.2d 813, 815 (2d Cir.1992); *Security Fin. Group, Inc. v. Northern Ky. Bank & Trust, Inc.*, 858 F.2d 304, 307 (6th Cir.1988); Md.Code Ann., Commercial Law I § 5–103(d), cmt. 1 (1999 Supp.). Thus, if the letter of credit actually were a guarantee contract, as the district court held, and Banca del Sempione falsely certified a default, Provident Bank would have been within its rights to refuse payment on the guarantee until Banca del Sempione proved the default of the primary debtor.

■ In this case, however, Banca del Sempione was entitled to payment under the terms of the letter of credit whenever it presented conforming documents. Provident Bank had no duty to ascertain the truth of Banca del Sempione's certification. *See Amwest*, 977 F.2d at 128–29; *cf. Wichita Eagle & Beacon Publishing Co. v. Pacific Nat'l Bank*, 493 F.2d 1285 (9th Cir. 1974) (treating a document denominated as a letter of credit as a guarantee because the document's "substantive pro-visions require the issuer to deal not simply in documents alone, but in facts relating to the performance of a separate contract"); *Gunn–Olson–Stordahl Joint Venture v. Early Bank*, 748 S.W.2d 316, 320 (Tex. App.1988) (treating a document as a guarantee contract and not a letter of credit when the bank's obligation to pay arose

not upon the tender of conforming documents, but rather upon the bank's own factual determination. of actual performance of contract by beneficiary). Because the contractual exclusion provision in the Check Stop Payment Liability endorsement is limited to agreements by the insured to indemnify or hold harmless third parties, it excludes from coverage only those third-party obligations that the insured *assumed* rather than obligations that it *incurred*. A letter of credit is not an assumed liability but is instead a primary liability of the issuer. When Provident Bank failed to honor the terms of its letter of credit to Banca del Sempione, it breached its own obligation; it did not assume the obligation of the debtor in the underlying loan transaction. Accordingly, the wrongful dishonor claim fell within the coverage of the Check Stop Payment Liability endorsement, and Travelers' duty to defend that claim was triggered.

Because we conclude that Travelers Commercial General Liability policy imposed on Travelers a duty to defend the claim presented to it by Provident Bank, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED.*

WILKINS, Circuit Judge, dissenting:

I respectfully dissent. In my view, the majority, while acknowledging that "the duty to defend exists only if . . . the insurance contract contains language that imposes that duty," *ante*, at 142, proceeds to ignore that rule and rewrite the insurance contract based on the majority's perception of the terms to which it would have expected the parties to agree.

The relevant contract language is as follows. The form policy contains a "Section I–Coverages," which is divided into three subsections: "Coverage A. Bodily Injury and Property Damage Liability," "Coverage B. Personal and Advertising Injury Liability," and "Coverage C. Medical Payments." J.A. 21–25. Subsection A states,

"We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking *those* damages." *Id.* at 21 (emphasis added). Subsection B states, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this coverage part applies. We will have the right and duty to defend any 'suit' seeking *those* damages." *Id.* at 24 (emphasis added). Subsection C states, "We will pay medical expenses as described below for 'bodily injury . . . .'" *Id.* at 25. This subsection contains *no language* concerning a duty to defend. Similarly, the special endorsement appended to the policy states, "We will pay those sums you become legally obligated to pay as damages arising out of" check stop payment claims. *Id.* at 41. Like Subsection C, and unlike Subsections A and B, however, the endorsement at issue contains *no language* creating a duty to defend.

Instead of focusing on the contractual terms to which the parties agreed, the majority's analysis consists primarily of its identification of a number of reasons why it would have made sense for the contract to impose a duty to defend check stop payment claims. These include (1) that the policy provides for a duty to defend in regard to the other categories of liability coverage, (2) that liability coverage generally includes a duty to defend, (3) that certain conditions in the policy would have no benefit to the insurer with regard to check stop payment claims if there were no duty to defend, (4) that it was in the insurer's interest that the policy provide for a right and duty to defend, and (5) that the insurer initially concluded that it had a duty to defend.

The closest the majority comes to identifying any contract language purportedly creating a duty to defend check stop pay-

ment claims is when it notes that by its terms the endorsement "modifies insurance provided under the ... Commercial General Liability Part" of the policy. *Id.* The majority appears to believe that the "modifies" language indicates that the endorsement is a modification of Subsections A or B rather than a "stand-alone provision," and therefore that the duty to defend language from those subsections applies to check stop payment claims as well. *Ante,* at 144–45. The majority's analysis would be correct if the policy stated that the insurer had a duty to defend any suit in which the policy would provide coverage for a judgment against the insured. In that case, since the endorsement is incorporated into the policy, the general duty to defend would apply to check stop payment claims. The policy imposes no such general duty to defend, however. Rather, *the insurer's duty to defend explicitly extends only to claims of "bodily injury and property damage" and "personal and advertising injury."* Accordingly, even if the special endorsement is read as part of Subsection A or Subsection B, that does not change the fact that the duty to defend language in those subsections unambiguously does not apply to check stop payment claims.

In sum, I agree with the majority to the extent that it concludes that the parties might have been expected to have agreed that there would be a duty by the insurer to defend regarding check stop payment claims. Nevertheless, the law of Maryland is clear that a court should not undertake to rewrite an unambiguous insurance contract so as to provide for coverage that otherwise would not exist. *See Hankins v. Public Service Mut. Ins. Co.,* 192 Md. 68, 63 A.2d 606, 613 (1949); *Bernhardt v. Hartford Fire Ins. Co.,* 102 Md.App. 45, 648 A.2d 1047, 1052 (1993). Accordingly, I believe the district court correctly entered judgment against Provident, and I would affirm.