**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1078

SAMUEL BUCHBINDER,

Plaintiff - Appellant,

versus

RONY NATANZON,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  J. Frederick Motz, District Judge.  (1:03-cv-02945-JFM)

Argued:  September 19, 2006        Decided:  November 16, 2006

Before NIEMEYER, Circuit Judge, HAMILTON, Senior Circuit Judge, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished opinion.  Senior Judge Hamilton wrote the majority opinion, in which Judge Floyd joined.  Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** David Bart Goldstein, DANEKER, MCINTIRE, SCHUMM, PRINCE, GOLDSTEIN, MANNING & WIDMAN, P.C., Baltimore, Maryland, for Appellant.  Robert Benjamin Levin, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Brooke Schumm, III, DANEKER, MCINTIRE, SCHUMM, PRINCE, GOLDSTEIN, MANNING & WIDMAN, P.C., Baltimore, Maryland, for Appellant.  Paul Mark Sandler, John J. Leidig, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

HAMILTON, Senior Circuit Judge:

This is a breach of contract action with subject matter jurisdiction based upon diversity of citizenship. Samuel Buchbinder (Buchbinder) is the plaintiff, and Rony Natanzon (Natanzon) is the defendant. On cross-motions for summary judgment, the district court granted summary judgment in favor of Natanzon and denied summary judgment in favor of Buchbinder. Buchbinder appeals the district court's grant of summary judgment in favor of Natanzon. We affirm.

I.

In early 2001, as part of various business transactions with a Maryland limited liability company named ERN, LLC (ERN), Buchbinder entered into two letters of credit with UBS AG (UBS) in the aggregate amount of one million dollars on behalf of ERN's affiliated Israeli company (ERN Israel) and in favor of Bank Leumi. These two letters of credit (collectively the Letters of Credit) were issued to secure the obligations of ERN Israel to Bank Leumi. At the time of issuance, the Letters of Credit were set to expire on January 31, 2002. Under the "General Terms and Conditions" applicable to the Letters of Credit, Buchbinder agreed to reimburse UBS in the amount of any draw on the Letters of Credit made prior to January 31, 2002. (J.A. 179). As security for his obligations, Buchbinder posted cash and 85,000 shares of Concord EFS, Inc. stock

(the Concord Stock).  Notably, Buchbinder and UBS also expressly agreed in writing that the respective expiration dates of the Letters of Credit could not be extended without each other's written permission.

In late 2001, Bank Leumi requested that the respective expiration dates of the Letters of Credit be extended one year to January 31, 2003.  The parties do not dispute that both Buchbinder and UBS agreed to this request in writing.

The seed of the present litigation was planted, however, in early 2002 when UBS mistakenly notified Bank Leumi that the Letters of Credit had been extended to December 31, 2003.  Specifically, on January 9, 2002, UBS sent Bank Leumi a SWIFT message[1] mistakenly reporting December 31, 2003 rather than January 31, 2003 as the extended expiration date of the Letters of Credit, an eleven-month difference.

On July 12, 2002, Buchbinder and Natanzon entered into a memorandum of understanding (the MOU) to settle certain litigation then pending in the United States District Court for the District of Maryland.  As part of the settlement, the MOU provided that Buchbinder would transfer to Natanzon his fifty-percent ownership interest in ERN Israel, and "[i]n consideration of the immediate

---

[1]A "SWIFT message" is an electronic message sent through the global banking telecommunications network called the Society for Worldwide Interbank Financial Telecommunications. Boris Kozolchyk, The Paperless Letter of Credit and Related Documents of Title, 55 Law & Contemp. Probs. 39, 40-46 (1992).

transfer of said Buchbinder 50% interest, Natanzon guarantees personally that he will reimburse Sam Buchbinder without offset demand or counterclaim any draw on the $1,000,000 letters of credit with all costs and attorneys fees of collection."[2] (J.A. 83-84). As counsel for Buchbinder stated at oral argument in the present appeal, "the whole point to this personal guarantee to reimburse Buchbinder for any draws on the lettter[s] of credit was that Buchbinder would give up his fifty-percent interest in ERN Israel so that Natanzon would be the one-hundred percent owner and control the company in exchange for Natanzon substituting himself for financial responsibility on the letters of credit." Notably, the record in this case contains no evidence to suggest that, at the time Buchbinder and Natanzon executed the MOU, either man believed the Letters of Credit expired on any date other than January 31, 2003. In short, as far as the record reveals, UBS's unilateral extension of the Letters of Credit via its typographical error in the January 9, 2002 SWIFT message to Bank Leumi was unbeknownst to Buchbinder and Natanzon at the time they entered into the MOU on July 12, 2002.

All was quiet until January 29, 2003, when Bank Leumi notified UBS that it considered the Letters of Credit as valid and in force until December 31, 2003. In response, UBS advised Bank Leumi that

---

[2]From here forward, we refer to this quoted language as "the Reimbursement Provision."

it had made a typographical error in its January 9, 2002 SWIFT message confirming the extension of the expiration date of the Letters of Credit, and stated that January 31, 2003 was the intended and correct expiration date.  UBS  requested that Bank Leumi agree to cancel the Letters of Credit as of January 31, 2003. Bank Leumi rejected the request and notified UBS by SWIFT message on February 3, 2003,

> THAT ON STRENGTH OF YOUR EXTENSION UNTIL 31 DECEMBER, 2003 WE HAVE EXTENDED CREDIT LINE TO THE CUSTOMER.  THE CUSTOMER IS IN DEFAULT OF HIS OBLIGATIONS TO US UNDER THE CREDIT LINE AND WE THEREFORE DEMAND PAYMENT OF ONE MILLION USD, UNDER YOUR ABOVE STANDBY L/CS.
> WE HEREBY STATE THAT THE AMOUNT DEMANDED REPRESENTS AN AMOUNT WHICH E.R.N. NO. 1 LTD. HAS FAILED TO PAY WHEN DUE.
> PLEASE CREDIT OUR ACCOUNT WITH YOU UNDER SWIFT ADVICE TO US, QUOTING OUR ABOVE REF. NOS.

(J.A. 136).  On February 4, 2003, UBS sent Bank Leumi a SWIFT message requesting that Bank Leumi submit one claim per Letter of Credit in accordance with the terms of the Letters of Credit.  Bank Leumi complied with this request via two SWIFT messages on February 5, 2003.

On February 5, 2003, UBS fully honored Bank Leumi's draws on the Letters of Credit by paying Bank Leumi $1,000,000.  UBS then demanded that Buchbinder reimburse it for the $1,000,000 in draws. Buchbinder refused on the ground that he had not authorized any extension of the Letters of Credit beyond January 31, 2003.

On or about February 20, 2003, UBS debited funds totaling approximately $318,609 from Buchbinder's account with UBS without

Buchbinder's permission. UBS also refused to return the Concord Stock Buchbinder had pledged as partial collateral for the Letters of Credit.

On May 16, 2003, Buchbinder filed a civil action against UBS in the United States District Court for the Northern District of Illinois (the Illinois Action) on the basis of diversity jurisdiction. In the Illinois Action, Buchbinder sought the return of his $318,609 in cash and his Concord Stock under state law theories of conversion and unjust enrichment. According to Buchbinder, because he never authorized in writing extending the expiration dates of the Letters of Credit beyond January 31, 2003, he had no legal liability to reimburse UBS for any draws made on the Letters of Credit after that date. In support of his position, Buchbinder relied upon the terms of his agreement with UBS that the expiration dates of the Letters of Credit could not be extended without each other's written permission. In addition to the return of his cash and stock, Buchbinder also sought punitive damages, reasonable attorney's fees incurred in the action and costs. On May 29, 2003, UBS returned the Concord Stock to Buchbinder, but continued to retain his $318,609 in cash.

On October 15, 2003, Buchbinder filed the present civil action against Natanzon in the United States District Court for the District of Maryland (the Maryland Action) on the basis of diversity jurisdiction. In the Maryland Action, Buchbinder

initially sought to enforce the Reimbursement Provision of the MOU in an amount equal to the principal value of the seized assets ($1,000,000) plus costs, interest, and attorneys' fees. After UBS returned Buchbinder's $318,609 in cash on November 11, 2003, and Buchbinder and UBS settled the Illinois Action, Buchbinder modified his demand in the Maryland Action such that he now sought from Natanzon only: (1) $114,450.47, an amount representing his lost interest income on his seized collateral and his litigation expenses in the Illinois Action; and (2) an as yet to be finalized amount representing his attorneys' fees and costs in the Maryland Action.

Buchbinder and Natanzon made cross-motions for summary judgment. On December 14, 2005, the district court issued a Memorandum Opinion in which it denied Buchbinder's motion for summary judgment and granted Natanzon's motion for summary judgment. The heart of the district court's analysis in its Memorandum Opinion is as follows:

> The outcome of this case turns on the meaning of the words "any draw on the $1,000,000 letters of credit" in the MOU. Natanzon claims the money paid by UBS to Bank Lemui [sic] on February 5, 2003 was not a draw on the letters of credit under the MOU, which only contemplated timely and proper draws. Buchbinder contends the broad language ("*any* draw") of the MOU encompasses untimely payments. Although the issue is not free from doubt, I agree with Natanzon.[1]

> Maryland follows the law of objective interpretation of contracts, whereby a court must determine what a reasonable person in the position of the parties would have thought the language of the agreement to mean.

Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co., 844 A.2d 460, 469 (Md. 2004); Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999). In my view, a reasonable person in the position of the parties would not have understood "any draw on the . . . letters of credit" to include demands on letters that ceased to legally exist. If that had been the meaning of the words, in the MOU Nantanzon [sic] would have been assuming an obligation of infinite duration, unlimited by the express written terms of the letters of credit. Reasonable business people do not assume -- or expect others to assume -- such obligations.

_____

[1]To the extent that Buchbinder is now contending that the letters of credit had not expired on February 5, 2003, his contention is inconsistent with the allegation he made in the suit against UBS in the United States District Court for the Northern District of Illinois that "the Letters of Credit were expired and invalid at the time of the payment on February 5, 2003." Moreover, his allegation in the Illinois action was correct. The letters of credit did expire January 31, 2003. The letters specifically required Buchbinder's written consent to modify the expiration date, and such consent was not given to extend the letters past January 31, 2003. UBS's typographical error did not (and could not) breathe life into the letters of credit after their expiration date, because UBS never had the power to act unilaterally to extend the letters.

(J.A. 488-89). The district court entered final judgment in favor of Natanzon. This timely appeal followed.

II.

We review the grant of summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). A motion for summary judgment may be granted if "there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a district court's grant of summary judgment, we must construe the facts in the light most favorable to the non-moving party; here, Buchbinder. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc).

                              III.

The parties agree that Maryland law applies to the substantive legal issues in this case. Under Maryland law, "when the language of the contract is plain and unambiguous, there is no room for construction, and a court must presume that the parties meant what they expressed." Towson Univ. v. Conte, 862 A.2d 941, 947 (Md. 2004). Significantly, "[i]n these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Id.

If, on the other hand, the contractual language at issue is ambiguous, the trier of fact must resolve the ambiguity. University of Baltimore v. Iz, 716 A.2d 1107, 1121 (Md. Ct. Spec. App. 1998); see also Atalla v. Abdul-Baki, 976 F.2d 189, 192 (4th Cir. 1992). Under Maryland law, contractual language is ambiguous if, when read by a reasonably prudent person, the language is susceptible of more than one meaning. Calomiris v. Woods, 727 A.2d

- 10 -

358, 363 (Md. 1999). "The determination of whether language is susceptible of more than one meaning includes a consideration of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Id. (internal quotation marks omitted). Whether contractual language is ambiguous is a question of law for the court. Id. at 362.

Here, Buchbinder premises his theory of liability against Natanzon upon the independence principle of letter of credit law and what he considers the plain and unambiguous meaning of the phrase "any draw" in the Reimbursement Provision. The independence principle of letter of credit law provides that, upon presentation of a draft against a letter of credit which is accompanied by certifying documentation, the bank becomes obligated to honor the draft whether or not the documentation was substantively accurate. Provident Bank of Maryland v. Travelers Prop. Cas. Corp., 236 F.3d 138, 147 (4th Cir. 2000). Thus, the obligation of the letter of credit's issuer, here UBS, to the letter of credit's beneficiary, here Bank Leumi, is independent from any obligation between the letter of credit's issuer and the customer of the letter of credit's issuer, here Buchbinder. See id.

Buchbinder relies upon the independence principle to argue that, because the Letters of Credit were valid as between UBS and Bank Leumi until December 31, 2003, Bank Leumi's full draws on the Letters of Credit on February 5, 2003 simultaneously triggered a

$1,000,000 reimbursement obligation on the part of Natanzon under the "any draw" language of the Reimbursement Provision. After all, as Buchbinder's argument goes, the term "any" means "'regardless of sort, quantity, or number' and 'without restriction or exception,'" (Buchbinder's Opening Br. at 17) (quoting Webster's II New Riverside Univ. Dictionary, 115 (1984)), and therefore, the "any draw" language in the Reimbursement Provision, means all draws without exception, not just those draws which reasonable business people would consider timely and proper, (J.A. 26). We note that, having subsequently regained possession of his $1,000,000 in collateral from UBS, the relief Buchbinder currently seeks in the Maryland Action is judgment in an amount equal to: (1) the interest income from which he was deprived during UBS's improper seizure of his collateral and his litigation expenses in the Illinois Action ($114,450.47); and (2) his attorneys' fees and costs in the Maryland Action (an amount yet to be finalized).

While we ultimately decide to affirm the judgment below, we initially note our agreement with Buchbinder on one significant point of letter of credit law. Specifically, we agree with Buchbinder's assertion that the district court erred in holding that, at the time of Bank Leumi's February 5, 2003 draws on the Letters of Credit, the Letters of Credit had ceased to legally exist. The district court reasoned that the Letters of Credit completely expired on January 31, 2003, because Buchbinder had

never given his written permission to extend the expiration dates on the Letters of Credit beyond January 31, 2003. The district court's reasoning is at odds with the well-established independence principle of letter of credit law, which provides for the independence of each distinct relationship pertaining to a particular letter of credit.

Buchbinder's legally enforceable financial obligations under the Letters of Credit had most definitely expired as of January 31, 2003. Thus, under the independence principle, the Letters of Credit had expired between UBS and Buchbinder as of January 31, 2003, but remained intact as between UBS and Bank Leumi until December 31, 2003. This is so despite the fact that Buchbinder's legally enforceable financial obligations under the Letters of Credit expired as of January 31, 2003. Indeed, UBS recognized the Letters of Credit as valid between it and Bank Leumi by honoring Bank Leumi's February 5, 2003 draws on them.

As will become evident from our following discussion, the fact that the Letters of Credit remained valid and in force as between UBS and Bank Leumi does nothing to aid Buchbinder's breach of contract claim against Natanzon. At this point, we turn our attention to the operative language of the Reimbursement Provision: "In consideration of the immediate transfer of said Buchbinder 50% interest [in ERN Israel], Natanzon guarantees personally that he will reimburse Sam Buchbinder without offset demand or counterclaim

any draw on the $1,000,000 letters of credit with all costs and attorneys fees of collection." (J.A. 83-84). Focusing on the plain meaning of this language, we completely agree with counsel for Buchbinder's statement at oral argument, that "the whole point to this personal guarantee to reimburse Buchbinder for any draws on the lettter[s] of credit was that Buchbinder would give up his fifty-percent interest in ERN Israel so that Natanzon would be the one-hundred percent owner and control the company <u>in exchange for Natanzon substituting himself for financial responsibility on the letters of credit</u>." (emphasis added). A reasonable person in the position of the parties would have thought no different.

This point is fatal to Buchbinder's breach of contract claim against Natanzon. The term "reimburse," which means "[t]o pay back," <u>American Heritage Dictionary, 4th Ed.</u>, 705 (Houghton Mifflin 2001), inherently assumes a prior pay-out. Here, Buchbinder rightly concedes that he did not pay-out any funds or assets in connection with any legally enforceable financial responsibility that he had with respect to the Letters of Credit. Indeed, in his reply brief, Buchbinder affirmatively states: "the Buchbinder-UBS part of the Letter of Credit transaction had expired as of January 31, 2003, and UBS could not enforce its Letter of Credit agreement against Buchbinder." (Buchbinder's Reply Br. at 10). Buchbinder even adds that "UBS's repayment of the $1 million to [him] confirms [his] position." <u>Id.</u> Also, the record in this case is devoid of

- 14 -

any evidence suggesting that, at the time Buchbinder and Natanzon executed the MOU, either man believed the Letters of Credit expired on any date other than January 31, 2003. Thus, the January 31, 2003 date was the date both men understood as the end of Buchbinder's legally enforceable financial responsibility with respect to the Letters of Credit.

The fact that Buchbinder suffered damages in the form of lost interest-income and incurred attorneys' fees in connection with reacquiring his wrongfully seized assets from a third-party has nothing to do with reimbursing Buchbinder for any legally enforceable financial responsibility that he had on the Letters of Credit. Because Buchbinder did not pay-out any funds or assets in connection with any legally enforceable financial responsibility that he had with respect to the Letters of Credit, the damages Buchbinder seeks from Natanzon are not within the scope of Natanzon's obligations under the Reimbursement Provision. Buchbinder's argument that reasonable persons in the position of Buchbinder and Natanzon could have meant the Reimbursement Provision to obligate Natanzon to reimburse Buchbinder for an amount equal to the amount of any assets wrongfully seized by a third-party in connection with draws on the Letters of Credit, made after Buchbinder's legally enforceable financial responsibility on those Letters of Credit had expired, his lost interest income while his assets were wrongfully held by the third-party, and his

attorneys' fees in connection with reacquiring his assets is patently absurd.

In conclusion, we hold that, based upon the plain and unambiguous language of the Reimbursement Provision, once Buchbinder's legally enforceable financial obligations on the Letters of Credit expired as of January 31, 2003 (i.e., once Buchbinder's collateral was no longer legally at risk), Natanzon's reimbursement obligations under the Reimbursement Provision expired as well. Thus, the damages sought by Buchbinder in the present breach of contract action are not within the scope of the Reimbursement Provision.[3]

IV.

For the foregoing reasons, we affirm the district court's entry of summary judgment in favor of Natanzon.

AFFIRMED

---

[3]We note that Natanzon presses an alternative independent argument in favor of affirmance, which argument he presented to the district court, but which the district court did not address. Given our analysis, we do not address it either. The crux of Natanzon's alternative argument is that, pursuant to other terms of the MOU, no payment can be due from him under the Reimbursement Provision until July 31, 2007.

- 16 -

NIEMEYER, Circuit Judge, dissenting:

Samuel Buchbinder commenced this action against Rony Natanzon to enforce an indemnity agreement signed by Natanzon. In the agreement, Natanzon "guarantee[d] personally that he [would] reimburse Sam Buchbinder without offset demand or counterclaim <u>any draw</u> on the $1-million letters of credit with all costs and attorneys fees of collection." (Emphasis added). Natanzon gave this indemnification agreement in exchange for Buchbinder's transfer of his 50% interest in ERN Israel, a company that the two had theretofore jointly owned. While ERN Israel was jointly owned, Buchbinder had, on the basis of <u>his own</u> assets, obtained the issuance of the $1-million letters of credit for ERN Israel.

On cross-motions for summary judgment, the district court concluded that the letters of credit expired on January 31, 2003, even though the face of the documents indicated that they would not expire until December 31, 2003. The district court relied on the fact that the issuing bank had made an error in extending the letters of credit from January 31 to December 31, 2003, to conclude that the letters of credit had "ceased to legally exist" after January 31. But this conclusion overlooked the legal principle that letters of credit are enforced as written under the "independence principle." <u>See</u> <u>Provident Bank of Md. v. Travelers Prop. Ca. Corp.</u>, 236 F.3d 138, 147 (4th Cir. 2000). Accordingly, when the Israeli bank drew on the letters of credit after January

31 but before December 31, the issuing bank was obligated under well-established principles to pay the Israeli bank the $1 million. The district court, however, reasoned from its erroneous finding that the letters of credit "ceased to legally exist" after January 31 to conclude that there could no longer be a draw as referred to in Natanzon's indemnity agreement after that date.

The majority opinion appropriately recognizes that the letters of credit did not cease to exist, because on their face they had not expired. The Israeli bank was entitled to rely on the letters of credit as written under the "independence principle" that attends letters of credit. See Provident Bank of Md., 236 F.3d at 147.

But the majority then ignores the plain language of Natanzon's indemnity agreement and reforms the agreement to conform to its understanding of the contextual transaction. I respectfully submit that we are not free to reorder the parties' expectations that were clearly and unambiguously stated in a binding document. The agreement required Natanzon to indemnify Buchbinder for "any draw on the $1-million letters of credit." "Any" means any, i.e., every. See Norfolk Southern Ry. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 31 (2004) (chiding court of appeals for limiting the meaning of "any" as used in a contract); United States v. Gonzales, 520 U.S. 1, 5 (1997) (noting that "any" means "'one or some

indiscriminately of whatever kind'" (quoting Webster's Third New Int'l Dict. 97 (1976))).

The Israeli bank in effect paid $1 million to Natanzon by drawing on the $1 million letters of credit in accordance with their terms to discharge Natanzon's debt to the bank. Under the indemnity agreement, Natanzon then became obligated to reimburse Buchbinder for that draw. In failing to recognize this obligation, we now inappropriately rearrange the business relationships and provide Natanzon with a $1 million windfall that he otherwise would not have had.

Accordingly, I would reverse.